[Crim. No. 14569. In Bank. Aug. 24, 1971.]

In re WILLIAM K. C. FERGUSON on Habeas Corpus.

## COUNSEL

Phillip E. Johnson, under appointment by the Supreme Court, for Petitioner.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, Derald E. Granberg and Don Jacobson, Deputy Attorneys General, for Respondent.

## OPINION

**PETERS, J.**—William K. C. Ferguson was convicted of kidnaping Mr. and Mrs. Miller and of six sexual offenses against Mrs. Miller in a jury trial. He petitions for a writ of habeas corpus, alleging that the prosecution suppressed evidence in failing to disclose the arrest record of Mr. Miller, which would have shown 37 entries including a felony conviction and commitments to state hospitals as a sex degenerate and a psychotic. He also claims that he was denied effective assistance of counsel because his attorney failed to investigate and discover the arrest record.

At the commencement of trial upon the objection of defendant, a hearing was held as to the competency of Mrs. Miller to testify. She was 28 years old and had completed the eighth grade. She had two children who were living with her mother "until we get a place."[1] She could not read or write, did not know her present address, did not know in which year or which state she was born, did not know what it meant to swear to tell the truth, and did not know what an oath was. She knew what was the truth as opposed to lying, believed in God, and said that she would tell the truth.

The trial court stated that the test of competency is whether or not the witness has the ability to perceive, to recollect and to recount an event plus some "indication of the distinction between telling the truth and not telling the truth," and concluded that the witness was competent to testify.

The testimony of Mr. and Mrs. Miller may be summarized as follows: Shortly after midnight on July 20, 1968, they arrived at the Santa Ana bus

---

[1] It is asserted by petitioner's present counsel, without contradiction, that the two children were taken from Mrs. Miller as a result of action of the district attorney's office.

depot after spending the evening with relatives in Indio. They decided to walk a short distance and then hitchhike home. Petitioner pulled over and offered them a ride, and when they refused the offer, petitioner told them to get into the car. He had his hand in his pocket and said he had a gun aimed at them. They did not see the gun. After driving a few blocks petitioner stopped, said he was a sex pervert, and told Mr. Miller to have sexual intercourse with his wife. After Mr. Miller refused, petitioner raped her and performed an act of oral copulation.

Petitioner then ordered Mr. Miller out of the car saying he wanted to be alone with Mrs. Miller for 15 minutes and would give her $50. Petitioner said he had a gun pointed at Mrs. Miller and would kill her if Mr. Miller did not leave. Petitioner placed something hard against Mrs. Miller's head, and fearing for her life she told her husband to do as ordered. Thereafter petitioner drove away with Mrs. Miller and committed additional sexual acts. She submitted due to fear. She asked him to take her back to her husband, and petitioner drove around looking for Mr. Miller until he was stopped by a police officer.

After being forced out of the car, Mr. Miller walked up and down the street looking for a house with lights on. He found one about a block and a half away and called the police. It took him about 25 minutes to find the house.

Mrs. Joanne Aston testified that Mr. Miller came to her house between 1:15 and 1:30 a.m. and asked to call the police. He said that a man with a gun had threatened him, made him get out of the car, and leave his wife.

A police officer testified that he received the call to proceed to the Aston residence at 1:36 a.m. and was subsequently told by Mr. Miller that his wife had been kidnaped and raped. He drove around with Mr. Miller, saw the car at 4:15 a.m., and flashed his red light. The car stopped. Mrs. Miller claimed that "the man had forced her to have sex with him." She seemed to be in a state of shock. Petitioner was not armed.

Petitioner's testimony may be summarized as follows: As he was driving down the street he saw Mr. Miller waving his hand, either flagging him to stop or hitchhiking. Petitioner picked the Millers up and after he drove about two blocks he saw that Mr. Miller had raised his wife's dress and was "playing" with the upper part of her leg. Mr. Miller offered his wife to petitioner and asked him how much money he had. Petitioner responded that he had only four or five dollars, and the Millers discussed whether she would be willing to go with petitioner for that amount of money. She finally agreed, and petitioner said he would return with her in 15 or 20 minutes. After Mr. Miller left the car, petitioner drove about three blocks and

stopped, but cars came by shining their lights, and she asked him to go to a more private place. He then drove to an orange grove where several sexual acts occurred. He then drove back and was arrested while looking for Mr. Miller. He denied threatening either of the Millers at any time. After his arrest he was advised of his rights, and he told the officers that he had sexual relations with Mrs. Miller. He admitted that in 1962 he was convicted of second degree robbery and using false names and addresses to obtain Percodan tablets.

At the hearing on the motion for new trial, petitioner again proclaimed his innocence and stated that he had "begged" for a lie detector test and signed a stipulation prior to the trial that the results would be admissible. He complained because the test had been refused. He also complained of the lack of investigation, and said that now an investigation had revealed that Mrs. Miller could read and write and had been arrested for disorderly conduct. The deputy public defender who represented petitioner at the hearing (apparently the one who represented him at trial had resigned in the interim) also stated that the girl's background had not been checked, that no "CII" was ever run, and that, although he had tried to do everything since then, he had been short of time and ran into a "blank wall."

The trial judge stated that the deputy public defender who tried the case is "a most effective trial lawyer," that the case came down to one of credibility as to whether petitioner or the lady and her husband were telling the truth, and that the jury found against petitioner. The trial judge also stated that if petitioner "doesn't think that the District Attorney properly inquired as to the background of the lady involved and her husband, there is not very much I can do about that, and I don't know that that failure to inquire, if there was such a failure, is a ground for any kind of relief. [¶] After all, the case had been pending for several months at the time the case was tried and we all know the realities of life are that you just try one case after another and have to try many hundreds of felony criminal cases per year and dispose of a couple of thousand criminal cases per year, and, while it would be nice to make each case a celebrated case and to explore each one back practically from the time of the birth of each of the personalities involved in the case, that is a luxury which our current culture does not allow us."

The judge sentenced petitioner to prison on each of the counts of which he was convicted, the sentences to run concurrent with each other but consecutive to a sentence for which he was presently on parole. The conviction was affirmed on appeal in an unpublished opinion.

An affidavit of the prosecuting attorney states that he has no recollection of seeing any "rap sheet" of Mr. Miller prior to or during the trial, that

there is no "rap sheet" in the district attorney's file, and that the general practice of the district attorney's office is to permit defense counsel to inspect the prosecution file without necessity of a formal motion. The prosecuting attorney was aware, prior to trial, that Mr. Miller was or had been on federal parole for violation of the Dyer Act (taking a stolen vehicle across a state line) and that he had been processed as a juvenile for something of a sexual nature. The prosecuting attorney also stated: "I was not concerned that [Mr.] Miller's background would be discovered by the defense for I felt he was a witness not a victim and his juvenile history some twelve to fifteen years earlier would be irrelevant."

An affidavit of petitioner's trial attorney states that he has no recollection of any effort to discover whether Mr. Miller had a criminal or arrest record or of any circumstances indicating that Mr. Miller had a criminal record. The attorney stated that it was not his custom to initiate discovery of a witness' criminal record in every case but only where there was some indication that a criminal history may exist or the case is of such a character that investigation appeared appropriate in the absence of indications that a prior criminal record exists.

An affidavit of the deputy public defender who represented petitioner at sentencing states that the chief investigator of his office, when asked after trial why no investigation had been made on the investigator's motion, answered: "What was there to investigate? Even a whore has her rights." The affidavit also states that relations between the investigator and petitioner's trial attorney "were quite strained," that after trial but before sentencing a response of the Bureau of Criminal Identification and Investigation to a teletype request of the county marshal revealed an arrest of Mrs. Miller as a disorderly person in Las Vegas but no information as to Mr. Miller.

The Las Vegas arrest of Mrs. Miller was for being asleep with her husband in a bus depot without funds. The reason the request failed to turn up Mr. Miller's "rap sheet" apparently was that he was misdescribed in the request. The driver's license number was apparently erroneous, his middle name was omitted from the request, and the request described him as 6 feet tall and 170 pounds whereas the records of the bureau described him as 6 feet 4 inches tall and 200 pounds. The record does not show, and no contentions are made by either party with regard to, the reason for these discrepancies.

The major matters shown by the "rap sheet" of Mr. Miller are as follows: The first entry dated March 7, 1955, states that Mr. Miller, who was born in 1939, was sent from the Los Angeles County Juvenile Court to the South Reception Center Clinic in Norwalk as a "SUB. K—SEX DEGEN-

ERATE." He was paroled in June 1956, but was returned to the California Youth Authority late in October 1956, and committed to Atascadero State Hospital in January 1957. He was discharged from Atascadero in May 1957, but was recommitted to Atascadero in June 1957 as a "PSYCHO. DELINQ. INDET. 7058." He was paroled at the end of November 1958. In May 1960, he was arrested for grand theft, auto, and for joyriding. The charge for grand theft, auto, apparently was not filed, and the disposition of the joyriding charge is not clear. In June of 1960 he was again committed to Atascadero, and this time as a "P.D.I. 7058 WIC," and was paroled in January 1961.[2] In October 1963, he was convicted of two counts of forgery. The sentence was fixed at six months. In April 1965 he was arrested for burglary and possession of stolen property but apparently the charges were dismissed. In May of that year he was arrested for escape by a misdemeanant, theft of an automobile, and forgery. Apparently the theft charge was dismissed, but the disposition of the other charges is not clear. In June his probation was terminated. In July 1965 he was arrested for violation of the Dyer Act (transporting stolen vehicle across state lines) and was sentenced to three years. He was paroled in June 1967, but later that month was sentenced in Riverside to six months for a misdemeanor contempt.[3]

The duty of the district attorney is not merely that of an advocate. ▆▆▆ His duty is not to obtain convictions, but to fully and fairly present to the court the evidence material to the charge upon which the defendant stands trial, and it is the solemn duty of the trial judge to see that the facts material to the charge are fairly presented. (*People* v. *Kiihoa,* 53 Cal.2d 748, 753 [3 Cal.Rptr. 1, 349 P.2d 673]; *People* v. *Sheffield,* 108 Cal.App. 721, 732 [293 P. 72].) In the light of the great resources at the command of the district attorney and our commitment that justice be done to the individual, restraints are placed on him to assure that the power committed to his care is used to further the administration of justice in our courts and not to subvert our procedures in criminal trials designed to ascertain the truth.

The search for truth is not served but hindered by the concealment of relevant and material evidence. Although our system of administering criminal justice is adversary in nature, a trial is not a game. ▆▆▆ Its ultimate goal is the ascertainment of truth, and where furtherance of the adversary system comes in conflict with the ultimate goal, the adversary system must give way to reasonable restraints designed to further that goal.

---

[2]Apparently he was in the army for some period between January 1961 and November 1963.

[3]A number of arrests for vagrancy, disorderly conduct or other such matters have been omitted.

■ Implementation of this policy requires recognition of a duty on the part of the prosecution to disclose evidence to the defense in appropriate cases.

■ It is settled that the intentional suppression of material evidence upon request denies the defendant a fair trial. (*Brady* v. *Maryland*, 373 U.S. 83, 87 [10 L.Ed.2d 215, 218-219, 83 S.Ct. 1194]; *In re Lessard*, 62 Cal.2d 497, 508 [42 Cal.Rptr. 583, 399 P.2d 39]; *In re Imbler*, 60 Cal. 2d 554, 567-570 [35 Cal.Rptr. 293, 387 P.2d 6]; *People* v. *Kiihoa, supra*, 53 Cal.2d 748, 752; *In re Razutis*, 35 Cal.2d 532, 535 [219 P.2d 15]; *McCullar* v. *Superior Court*, 264 Cal.App.2d 1, 7 [70 Cal.Rptr. 21].) The good or bad faith of the prosecutor is not determinative. (*Brady* v. *Maryland, supra*, 373 U.S. 83, 87.) Thus in *People* v. *Kiihoa, supra*, 53 Cal.2d 748, 752, the prosecuting authorities, to protect the identity and safety of an informant, delayed prosecution until the informant had left the state. Justice White speaking for the court pointed out that "however praiseworthy was the prosecution's motive in protecting the informer from the threat of reprisal," we could not be indifferent to the resulting denial of the defendant's substantial rights, and those "motives and purposes cannot prevail when, as here, they inevitably result, intentionally or unintentionally, in depriving the defendant of a fair trial." (53 Cal.2d at p. 754.)

■ Although a request for production of evidence may be a factor to consider in determining a charge of suppression of evidence, we have recognized that "in some circumstances the prosecution must, without request, disclose substantial material evidence favorable to the accused." (*In re Lessard, supra*, 62 Cal.2d 497, 509.) Conditioning the duty to disclose and produce evidence upon request would mean that the duty to disclose would be inapplicable to numerous situations where the failure to disclose would deprive the accused of a fair trial. For example, in *People* v. *Kiihoa, supra*, 53 Cal.2d 748, 751-754, any request would not be made until after the witness had departed the jurisdiction. Thus, if a request was a condition to the duty, the duty would not arise until it became impossible of performance and would seem to be excused by impossibility.

Moreover, to condition the duty to disclose upon request would provide a trap for the unwary and place substantial additional burdens on our busy trial courts. The general practice of making the district attorney's file available to defense counsel in Orange County is also followed in many other counties in this state, and this practice can only serve to provide a trap for the unwary if the prosecuting attorney does not know that he is under a duty to disclose evidence favorable to the defense but instead feels that he is free to omit such favorable evidence from his file. On the other hand, if the prosecutor has no such duty, defense counsel in the exercise of

due caution to protect his client's interests can be expected to refuse to rely upon the prosecutor's file and to make in every case long and complex motions for discovery to ascertain whether the prosecutor is hiding anything. To adopt rules so greatly increasing the burden of our already busy criminal courts would not serve the efficient administration of justice.

The Attorney General commendably recognizes that where "the evidence is substantial, material, and favorable to the defense, no request is necessary."

In the instant case, the prosecutor was admittedly aware of the felony conviction and that Mr. Miller had been processed as a juvenile for something of a sexual nature. He must have been aware that Mr. Miller could be impeached by the felony. The fact that the felony conviction was not a sexual crime does not mean that knowledge of the conviction would not be useful to the defense. Conviction of a felony not a sexual crime was used at trial to impeach petitioner. The prosecuting attorney must also have realized that, if the defense was aware that Mr. Miller has a prior sexual record, it would make substantial efforts to discover the extent and nature of that record. The prosecutor did not disclose either the felony or his knowledge of Mr. Miller's sexual offense,[4] although he must have been aware that knowledge of the felony conviction would be of aid to the defense and the court and that there was substantial likelihood that knowledge of the juvenile offense might lead the defense to favorable evidence. He did not at trial, as is often done by prosecutors to soften the impact, bring out the felony conviction on the direct examination of his witness. In the circumstances, we are satisfied that the prosecutor should have known the information was favorable to the defense and that he intended not to disclose it.

In considering the materiality of the evidence, we must look to the entire record because materiality can only be determined in the light of the circumstances. Thus we must consider not only the other evidence of guilt but also any other defense evidence which might have caused a different verdict. In addition, where, as here, it is apparent that the disclosure of the evidence concealed would have logically led to other evidence, such other evidence which has been found since the trial must also be considered. The basis of the rule requiring disclosure by the prosecution, as we have seen, is that the defendant may otherwise be deprived of a fair trial, and thus we must consider all of the matters bearing on the ultimate question of the fairness of the trial.

---

[4]There is no claim that information as to the felony or the juvenile sexual misconduct were included in the prosecutor's file which was available to the defense.

Sexual offenses ordinarily occur in private with the alleged perpetrators and the alleged victims as the only witnesses. In this kind of case more than any other, the defendant's plea of innocence challenges the credibility of the alleged victim, and a minimal defense requires that the alleged victims be accused of falsehood, spite or delusion. (*People* v. *Covert,* 249 Cal.App.2d 81, 88 [57 Cal.Rptr. 220].) When the defense is that the prosecuting witnesses, rather than the defendant, were guilty of criminal acts, the necessity of attacking the credibility of the prosecuting witnesses is, if anything, greater.

■ In sex offense cases the rules concerning permissible methods of impeachment of the prosecuting witnesses are more liberal than those allowed generally. ■ In such cases, evidence of the mental and emotional stability of the prosecuting witnesses is admissible in appropriate situations. (*Ballard* v. *Superior Court,* 64 Cal.2d 159, 173-174 [49 Cal. Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416]; *People* v. *Neely,* 228 Cal. App.2d 16, 20 [39 Cal.Rptr. 251, 20 A.L.R.3d 679].) Of course, evidence of the commission of a felony is admissible. (Evid. Code, § 788.) Finally, section 1103 of the Evidence Code allows the admission of evidence of the "character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim of the crime . . . if such evidence is: (a) Offered by the defendant to 'prove conduct of the victim in conformity with such character or trait of character. . . ."[5]

■ We have concluded that in the circumstances of the case the suppressed evidence must be deemed material and the suppression deprived petitioner of a fair trial. The prosecuting witnesses claimed that petitioner kidnaped them and by threat of force committed sexual offenses upon Mrs. Miller. Defendant claimed that he did not kidnap, that there was no threat of force, and that Mr. Miller was guilty of criminal conduct in pandering his mentally retarded wife. The prosecution's corroborating evidence was not overwhelming; Mr. Miller's complaint was made concededly more than 15 minutes after petitioner left with his wife, subsequent to the time in which he was to return, according to petitioner, and Mrs. Miller's statements were made after being stopped by an officer. The fact that petitioner, when arrested, had Mrs. Miller in the car was incriminating only in the light of the Millers' testimony, since he was admittedly

---

[5]Because of the broad rules of admissibility of evidence as to the character and traits of the prosecuting witness in a sex offense case, it is unnecessary to determine the Attorney General's contention that the commitments to the state hospitals would not be admissible. The Attorney General has ignored the fact that Mr. Miller was a victim, and it is clear that, whether or not evidence of his commitments is admissible, his mental condition was a proper subject of inquiry. (*Ballard* v. *Superior Court, supra,* 64 Cal.2d 159, 173-174.)

searching for Mr. Miller at the time, a matter somewhat inconsistent with the prosecution's version of threats of force by use of a gun. It may be noted that no gun was ever found.

In these circumstances, the credibility of the Millers and petitioner was the crucial issue. The prosecution, which apparently secured petitioner's "rap sheet," was able to impeach him by his 1962 convictions of second degree robbery and using fraudulent names and addresses to obtain Percodan tablets. Had the defense known that Mr. Miller had also suffered a felony conviction and had been committed to a state hospital as a sexual degenerate as a youth and again committed after he reached 21 years of age, it is reasonably probable that it could have obtained a different verdict. Evidence as to Mr. Miller's felony conviction and his mental stability when coupled with the obvious mental limitations of Mrs. Miller may well have caused the jury to refuse to find beyond a reasonable doubt that their version of the occurrence was true.[6]

The writ is granted. The judgment is vacated in its entirety, and petitioner is remanded to the custody of the Superior Court of Orange County for a new trial.

Wright, C. J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

**McCOMB, J.**—I dissent. I would deny the writ.

---

[6]Our conclusion that petitioner is entitled to a new trial makes it unnecessary to reach the question whether he was denied effective assistance of counsel.