[Crim. No. 1843. Fifth Dist. May 4, 1976.]

THE PEOPLE, Plaintiff and Respondent, v.
RONNIE LYNN WESTMORELAND et al.,
Defendants and Appellants.

[Crim. No. 2556. Fifth Dist. May 4, 1976.]

In re RONNIE LYNN WESTMORELAND on Habeas Corpus.

[Crim. No. 2557. Fifth Dist. May 4, 1976.]

In re CHARLENE SUE EASLEY on Habeas Corpus.

[Crim. No. 2562. Fifth Dist. May 4, 1976.]

In re SHIRLEY ELLEN BRAMLETTE on Habeas Corpus.

**COUNSEL**

George A. Boyle, William J. Owen, under appointments by the Court of Appeal, Bowles & Etcheverry, James G. Bowles and Louis P. Etcheverry for Defendants and Appellants and for Petitioners.

Roger S. Hanson as Amicus Curiae on behalf of Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Eddie T. Keller, Robert D. Marshall and Joel Carey, Deputy Attorneys General, for Plaintiff and Respondent and for Respondent.

## OPINION

**GARGANO, J.**—After a joint trial, appellants Ronnie Lynn Westmoreland, Charlene Sue Easley and Shirley Ellen Bramlette were convicted by a jury of kidnaping for the purpose of robbery with bodily injury (Pen. Code, § 209), robbery in the first degree (Pen. Code, §§ 211, 211a) and assault with intent to commit murder (Pen. Code, § 217). Appellants have appealed from the judgments entered on the jury's verdicts, raising numerous contentions for reversal. Because appellants wish to go outside of the record to present additional evidence on a crucial constitutional point, each also has petitioned for a writ of habeas corpus. Accordingly, we have consolidated the habeas corpus proceedings with the appeal. (*In re Hwamei* (1974) 37 Cal.App.3d 554, 557 [112 Cal.Rptr. 646]; *In re Miller* (1973) 33 Cal.App.3d 1005, 1009 [109 Cal.Rptr. 648].)

On Friday, May 18, 1973, Ronnie Westmoreland, Charlene Easley and Shirley Bramlette went to the apartment of Doria Jean Star, who was managing the apartment complex where she was living; Westmoreland and Easley were living together in an apartment in Bakersfield along with Easley's three children, and they were trying to find another apartment; Star and Easley were friends, and both were former employees at a bar and pool room in Bakersfield known as the Tradewinds.

Shortly after the group arrived at Doria Star's apartment, Star's boyfriend and the boyfriend's employer dropped by for a visit. During the conversation that followed, the Tradewinds was mentioned. Charlene Easley and Ronnie Westmoreland said that recently they had been "kicked out" of the establishment and told not to come back; Westmoreland said that some night he was going to go down there to cause some trouble; Easley added that she would like to get even with Gary Glasgow, the owner of the Tradewinds.

Three days later, on the evening of May 21, 1973, Raymond Ray Robison, an 18-year-old man with an I.Q. of 60, went to Shirley Bramlette's apartment to babysit her 5 children; Robison and Bramlette were friends, and on several occasions he had spent the night at her apartment. Bramlette lived in the same apartment complex as Westmoreland and Easley, and about 10 minutes after Robison arrived, Ronnie Westmoreland and Charlene Easley entered Bramlette's apartment. Then, Robison was asked to join Westmoreland, Easley and Bramlette for a game of pool at a Bakersfield bar, and the young man accepted; the two couples proceeded to the bar in Westmoreland's 1965 red Ford Mustang, arriving at approximately 11 p.m.

About two hours later, the group left the bar and, in Westmoreland's automobile, drove to the Tradewinds. When they arrived, Connie Sue Johnston, a new employee, was the only person on duty; there were five customers in the establishment. The two couples walked to a back room and commenced to play pool. The waitress then approached to take their orders; the group ordered beer.

A few minutes later, as Johnston was cleaning the bar, Charlene Easley walked up, told her she was a former employee and ordered a sandwich; by then the time was approximately 1:15 a.m., and the other customers had left. As Johnston was locking the front door, Westmoreland approached and asked permission to go outside to his car to obtain a package of cigarettes. The waitress told him that he could and waited at the front door until he returned. After Westmoreland re-entered the bar, Johnston closed and locked the door; thereafter, she removed the money from the cash register and placed it in a money bag; carrying the bag and a key to the safe, she started toward a back room where the safe was located. Suddenly Westmoreland stepped up from behind, put his arm around the waitress and placed a .32 caliber automatic pistol at her head; he told her not to make any false moves and to hold out the money bag; he took the bag from the waitress and handed it to Shirley Bramlette. At about the same time, Charlene Easley put a pair of black gloves on her hands, took the key to the safe and went to the back room; she unlocked the safe, removed the money and left the key in the lock. In the meanwhile, Shirley Bramlette removed the waitress' purse from a shelf beneath the cash register; she also took some marked money which was used to operate the juke box.

After taking the money, Westmoreland and his three companions escorted Johnston to Westmoreland's car. They got into the vehicle, and

Westmoreland drove it away; Charlene Easley was sitting in the front seat on the passenger side; Raymond Robison was seated in the back behind Easley. Shirley Bramlette was in the back seat on the left hand side, and Connie Johnston was seated between Bramlette and Robison. Westmoreland had handed the pistol to Bramlette, who pointed it toward the waitress; Bramlette also rummaged through Johnston's purse.

During the drive, Westmoreland asked Johnston what she was going to tell the police; the waitress answered that she did not know. Bramlette suggested that Johnston say that four Mexicans committed the robbery and that they were driving a white 1965 Chevrolet.

After driving for more than an hour, Westmoreland stopped near some agricultural fields and got out of the car. Shirley Bramlette, Raymond Robison and Connie Johnston also got out of the vehicle; Charlene Easley remained seated in the front seat. Westmoreland told Johnston that she was going to be tied up and left; he ordered Robison to get some tape, but none could be found. About that time Shirley Bramlette, while pointing the pistol at the waitress, led her to an area approximately 20 yards from the side of the road. As she did so, Westmoreland removed a sawed-off shotgun from the car and pointed it in Robison's direction and told him to walk over to where the two ladies were standing. Then Bramlette directed Johnston to lie on the ground and to turn her head. Stating that she did not want the waitress to be able to identify the robbers to the police, Bramlette shot Johnston five times with the .32 automatic pistol; two bullets entered and exited through the neck, one bullet entered the side of the face and lodged in the base of the tongue; another bullet grazed the left shoulder, and the fifth bullet lodged in the left hand. Afterward, appellants and Robison drove back to appellants' apartments.

At approximately 3 a.m., Connie Sue Johnston was found by some passersby and was transported to the hospital; she recovered from her wounds.

Raymond Robison spent the night with Shirley Bramlette, and next morning he saw Bramlette burn the money bag which was taken in the robbery. He also watched as Bramlette removed decorative beads from Johnston's purse and burned the purse. At Bramlette's request, Robison took the beads, went outside and threw them over a fence.

At about 4:10 p.m., on May 22, 1972, Ronnie Westmoreland and Charlene Easley were arrested. In their apartment the police found a box

of ammunition for a .32 caliber automatic pistol with 12 shells missing, a cleaning kit for a .32 caliber weapon, a sawed-off shotgun and a few coins that had markings on them similar to the markings on the coins that were part of the money used in the operation of the juke box at the Tradewinds.

Within a few days, Shirley Bramlette and Raymond Robison were arrested. On May 31, 1973, the police found the beads Robison threw over the fence; they were in the backyard of the residence that abutted the rear of Shirley Bramlette's apartment.

At the trial, Connie Sue Johnston identified appellants as the persons who robbed and kidnaped her; she said that Shirley Bramlette was the one that shot her. In addition, Raymond Robison, who was charged with the same crimes as appellants and whose trial was scheduled to commence at a later date, testified for the People. He said that he was with appellants when Connie Johnston was robbed and when they drove the victim to a remote area near a field; he also said he witnessed the shooting. Robison further testified that he saw Shirley Bramlette burn the money bag and the waitress' purse and that at Bramlette's direction he threw the beads to the victim's purse over a fence.

At the commencement of his cross-examination, Robison denied that he ever was offered the opportunity to enter a plea of guilty to a lesser offense. The witness also created the distinct impression that he never had been offered leniency in exchange for his testimony and that he never had talked to his attorney or to the district attorney concerning any kind of deal.

Specifically, Robison was asked, and he answered, the following questions: "MR. ULMAN [Westmoreland's counsel]: Q. Now, has anybody offered you any type of a deal, say, if you pled guilty to a lesser offense in order to get you to testify? A. No. Q. Has anybody ever offered you any type of a deal in that regard? A. No. Q. The discussion of a plea to a lesser offense has never been discussed with you at all? A. No. Q. You have never discussed that with your attorney? A. No. Q. Your attorney never told you that the District Attorney was offering to drop the charges? A. No. Q. Down to a lesser offense? A. No. . . . Q. No. Is it your statement that you have never talked to anyone concerning a possible reduction of charges? A. I don't understand. Q. Have you ever talked to anyone about the charges that are against you now being possibly reduced in order to get you to testify? A. No."

Appellants' defense was that the money which was taken from the Tradewinds was stolen by Connie Johnston and Raymond Robison and that the waitress was shot by Robison, not Shirley Bramlette. They testified that Robison and Johnston were friends, that Robison asked appellants if the waitress could join them after she closed the bar, that they did not know that the money had been taken until after they left in Westmoreland's automobile and that it was Johnston who suggested that appellants take her to a field outside of town and tie her up so that she could tell the police that some Mexicans had robbed her. Appellants related that as Shirley Bramlette was beginning to remove some tape to tie up the waitress' hands, Robison suddenly pulled out a pistol and shot her; Westmoreland took the pistol away from Robison, and, thinking that Johnston was dead, appellants panicked and drove home; they then gave the pistol and Johnston's purse to Robison and told him to "hit the road."

Appellants also called Charles DeVries, an inmate of the Kern County jail, as a defense witness. DeVries testified that prior to his confinement he had seen Robison and Johnston together at various places in the Bakersfield area. The witness said that while in jail, Robison told him that he and Connie Johnston had stayed together in a local motel, that he had the gun on the night of the robbery and that Johnston had asked him to come down to the Tradewinds on the night of the crime. DeVries said that Robison further told him that he had a "deal" with the district attorney and that if he testified against appellants, the charges against him would be dropped.

We consider first appellants' contention that they were denied a fair trial because the deputy district attorney who prosecuted the case against them wilfully failed to disclose material evidence pertaining to the credibility of Raymond Robison, a key prosecution witness.

Briefly, the facts pertaining to this contention are these.

About one week after appellants were convicted of the crimes we have mentioned, the charges against Raymond Robison were dismissed on motion of the district attorney. Subsequently, appellants moved for a new trial.

At the hearing on the motion for a new trial, James Lanier, Robison's attorney, testified that two or three weeks before appellants' trial he talked to Michael Konnoff, the deputy district attorney who prosecuted

the case against appellants, and that Konnoff suggested that Robison should plead guilty to the lesser offense of accessory after the fact; the attorney then related the offer to his client and advised him not to plead guilty to anything. Lanier explained that a few days before the trial, he again reviewed the evidence against Robison with the deputy district attorney and that afterward the two men met with District Attorney Albert Leddy. Lanier asked for full immunity for Robison and for a dismissal of the charges; he was told that for "tactical reasons" the charges against his client would be dismissed after appellants' trial and that the offer of leniency should *not* be communicated to Robison. Lanier further explained that Robison would do what his attorney suggested, and believing that the charges against his client were going to be dismissed, he not only advised Robison to testify at appellants' trial but to tell the truth and prove his innocence. The attorney emphatically stated that it was his understanding that if his client testified, the charges against him would be dismissed.

Albert Leddy, on the other hand, denied that any promises of leniency were made to Robison's attorney in exchange for Robison's testimony. He said that at one time an offer had been made to allow Robison to enter a plea of guilty to the lesser offense of robbery, but he indicated that this offer was not made in exchange for favorable testimony; Leddy stated that the offer was rejected by Lanier who then requested that full immunity be given to Robison in exchange for his testimony. The district attorney declined the offer and informed Lanier that he was going to take a "wait and see" attitude.

Michael Konnoff admitted that he knew that an offer had been made to Robison to allow him to plead to the lesser offense of robbery and that the offer had been rejected by Robison's attorney. He also admitted that he personally talked with Robison's attorney two or three times before the trial and once or twice during trial, and that Lanier's request for immunity and the district attorney's refusal to grant immunity were discussed. Konnoff denied making any offers of leniency in exchange for Robison's testimony. He said that he told Lanier that there was a possibility that the charges against Robison would be dismissed and that this possibility depended upon the medical reports, the outcome of appellants' trial and whether the jury believed Robison's testimony. The deputy district attorney denied ever suggesting to Lanier not to discuss with Robison the "negotiations" between the district attorney's office and Lanier.

After the trial, Konnoff talked to the jurors, reviewed the transcript of Robison's testimony, read the medical reports on Robison and discussed the matter with Leddy. Thereafter, Leddy decided to dismiss the charges against Robison.

At the conclusion of the hearing, appellants' motion for a new trial was denied. It is the testimony adduced on the motion for the new trial and a taped conversation which took place between Raymond Robison and a relative prior to appellants' trial, that form the factual basis for the constitutional issue here presented; the taped conversation suggests that, at least, the relative knew that Robison was going to be released after appellants' trial and indicates that the relative communicated this information to Robison.

■ It is settled that due process proscribes a criminal conviction obtained through perjured testimony knowingly used by the prosecution against the accused. (*Pyle* v. *Kansas* (1942) 317 U.S. 213, 216 [87 L.Ed. 214, 216, 63 S.Ct. 177, 178]; *Mooney* v. *Holohan* (1935) 294 U.S. 103, 112 [79 L.Ed. 791, 794, 55 S.Ct. 340, 342, 98 A.L.R. 406].) In fact, outright falsity need not be shown if the testimony taken as a whole gave the jury a false impression. (*Alcorta* v. *Texas* (1957) 355 U.S. 28, 31 [2 L.Ed.2d 9, 11-12, 78 S.Ct. 103, 105].) Thus, a denial of due process can result if the prosecution, although not soliciting false evidence, allows a misleading and false impression to go uncorrected when it appears; it matters little that the false impression goes only to the credibility of a prosecution witness or that the prosecutor's silence was not the result of guile or a desire to prejudice. (*Napue* v. *Illinois* (1959) 360 U.S. 264, 269-270 [3 L.Ed.2d 1217, 1220-1222, 79 S.Ct. 1173, 1177].)

■ Likewise, it is settled that the failure to disclose material evidence to an accused deprives the accused of a fair trial, irrespective of the good or bad faith of the prosecutor. (*Brady* v. *Maryland* (1963) 373 U.S. 83, 87 [10 L.Ed.2d 215, 218-219, 83 S.Ct. 1194, 1196-1197].) This salutary principle also has its genesis in the due process clause and imposes upon prosecutorial authorities a strict duty to disclose all material evidence favorable to the defense whether or not it relates directly to the question of guilt and whether or not a request for a disclosure has been made. (*Giglio* v. *United States* (1972) 405 U.S. 150, 153-155 [31 L.Ed.2d 104, 108-109, 92 S.Ct. 763, 766]; *In re Ferguson* (1971) 5 Cal.3d 525, 533 [96 Cal.Rptr. 594, 487 P.2d 1234].) As the California Supreme Court explained in *People* v. *Ruthford* (1975) 14 Cal.3d 399, 406 [121 Cal.Rptr. 261, 534 P.2d 1341]: "We recognize the foregoing cases as establishing a

duty on the part of the prosecution, even in the absence of a request therefor, to disclose all substantial material evidence *favorable to an accused,* whether such evidence relates directly to the question of guilt, to matters relevant to punishment, or to the credibility of a material witness."

In short, a conviction knowingly obtained through the use of false testimony will not be tolerated. Nor is the failure to disclose evidence favorable to the accused consonant with the spirit of fair play visualized by the due process clause of the United States Constitution. █ Accordingly, prosecutorial authorities not only must disclose to the defense and to the jury any inducements made to prosecution witnesses for favorable testimony, but they are also under a duty to correct any false and misleading testimony pertaining to such inducements. (*Giglio* v. *United States, supra,* 405 U.S. 150, 154-155 [31 L.Ed.2d 104, 108-109, 92 S.Ct. 763, 766].) Failure to do so denies the defense access to material evidence, and this can result in the denial of a fair trial. (*People* v. *Ruthford, supra,* 14 Cal.3d 399, 406.)

In *Ruthford,* decided by the Supreme Court after appellants' trial was concluded, the defendant and one Frank Thomas were accused of the armed robbery of two victims; Thomas entered a plea of guilty in connection with one of the counts involved in the charges. Later, at defendant's trial, Thomas provided key testimony for the prosecution by naming the defendant as his accomplice in the robbery. Following defendant's conviction, Thomas wrote a letter to defendant stating that he testified against him because the district attorney had offered to procure a lenient sentence for Thomas' wife who had been convicted of another robbery she committed with her husband. Thereupon, defendant moved for a new trial.

At the hearing on the motion for the new trial, it was established that a deputy district attorney had discussed the possibility of the lenient sentence for Mrs. Thomas with the judge who was going to sentence her. It further was established that this fact was known to the deputy who prosecuted defendant and was not disclosed to defendant or his counsel either before or during the trial. As a consequence, defendant argued that he was entitled to a new trial because Thomas, with the knowledge of the prosecutor, had given perjured testimony at the trial. He also argued that the prosecutor's failure to apprise defendant's counsel of all the circumstances surrounding the witness' testimony deprived defendant of a fair trial. The motion was denied, and defendant appealed from the judgment of conviction.

In disposing of the first point, the Supreme Court remarked that the trial judge may well have concluded that Thomas' testimony was not perjured because at the trial he was asked only if *he* had received special consideration with regard to his plea bargain and his own sentencing.[1] (*Supra,* 14 Cal.3d at p. 404.) Addressing itself to the second point, the Supreme Court determined that the prosecutor's failure to apprise the defendant or his counsel of the circumstances which elicited Thomas' testimony foreclosed a crucial attack by the defense on the credibility of the key prosecution witness and prejudiced the defendant's case. (*Supra,* 14 Cal.3d at pp. 408-410.) The high court reversed the judgment.

In the case at bench, the trial judge had ample basis to believe that no offers of leniency in exchange for favorable testimony ever were made by the district attorney's office to Attorney Lanier or to his client Robison; if this were the only issue before us, we quickly would dispose of appellants' contention that they were deprived of a fair trial. Here, however, the prosecutor knew that Robison's negative answer to the question as to whether he had been offered the opportunity to enter a plea of guilty to a lesser offense was false; Mr. Konnoff had been told that a plea to a lesser offense of robbery had been offered to the witness, and the deputy himself had suggested to Lanier a plea to a charge of accessory after the fact. Konnoff also knew, or should have realized, that Robison's answers concerning the possibilities of leniency were misleading and created the distinct impression that there were no discussions on this subject; the prosecutor actually participated in discussions which took place with Lanier prior to and during appellants' trial. He even knew that Mr. Leddy told Lanier that the district attorney was going to take a "wait and see" attitude and denied that any suggestion was made to Lanier not to communicate this information to his client. Yet, as in *Ruthford,* he stood silently by, and his silence foreclosed further inquiry into the matter.

The crucial question is whether the prosecutor's omission amounted to a failure to disclose material evidence affecting the credibility of a key prosecution witness and, if so, whether the omission was harmless beyond a reasonable doubt. (*People* v. *Ruthford, supra,* 14 Cal.3d 399,

---

[1] The Supreme Court observed that Thomas was a clever witness, and when he was asked why he did not mention the offer of leniency at defendant's trial, he responded, " 'I was never even asked why did I testify. I was asked specifically was there leniency to me. I was asked specific questions about my own case[,] . . . and I answered the questions as they were asked. They were asked semantically. I answered them semantically.' " (*Supra,* 14 Cal.3d at p. 404.)

408-409; see *Chapman* v. *California* (1967) 386 U.S. 18, 23-24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 827-828, 24 A.L.R.3d 1065].)[2]

It hardly can be denied that Robison was a key prosecution witness. Appellants all testified that the theft of the money taken from the Tradewinds was committed by Connie Sue Johnston, and Robison verified the waitress' version of the robbery in every particular. He also gave extremely damaging testimony of his own: his testimony indicated that after he arrived at Bramlette's apartment on the evening of May 21, 1973, and before leaving with appellants at about 11 p.m., appellants were engaged in the planning of the robbery of the Tradewinds; he said that Bramlette shot the waitress and that later he saw her burn the money bag and the victim's purse; and he was the only witness who testified that at the scene of the shooting Westmoreland produced the sawed-off shotgun which later was found in Westmoreland's apartment. Clearly, the possibility that leniency had been offered to such a key witness who had every motive for lying would have had an impact on the jury; this is particularly true where, as here, the witness stated that his idea of the truth was the ability to tell the same story more than once.

The Attorney General suggests that our inquiry should end here for Robison's testimony could not have been tainted by inducements since Lanier testified that he did not tell Robison that an arrangement had been reached with the district attorney's office. However, had the prosecutor clarified Robison's misleading answers to the questions he was asked on cross-examination, the clarification would have led to Mr. Lanier's testimony that his client *would do anything the attorney advised,* that he had an understanding with the district attorney's office that the charges would be dismissed against Robison after his client testified and that for tactical reasons the lawyer was not to inform his client of the deal. In light of the district attorney's version of what occurred, this testimony could have implanted a serious doubt in the minds of the jurors as to his integrity and cast a pall on the People's case. Also, Lanier's testimony would have corroborated the testimony of the witness DeVries regarding his jailhouse conversations with Robison. Lastly, the clarification of Robison's misleading answers would have led to the discovery of the taped conversations between Robison and his relative, lending further credence to Lanier's version as to what occurred prior to

[2]In *Ruthford,* it is pointed out that when material evidence bearing upon the issue of guilt is suppressed or otherwise made unavailable to the defense by conduct attributable to the state, and such conduct results in a denial of a fair trial, reversal is required without weighing the degree of the prejudice to the accused. (*Supra,* 14 Cal.3d at pp. 406-407.) But when evidence bearing upon the credibility of a witness is withheld prejudice must be demonstrated. (*Supra,* 14 Cal.3d at p. 408.)

appellants' trial and to appellants' position that Robison knew that the charges against him would be dismissed if he testified for the People.

It is evident that the prosecutor's failure to clarify Robison's misleading testimony amounted to the withholding of material evidence pertaining to the credibility of a key prosecution witness' testimony; because it cannot be said that it is clear beyond a reasonable doubt that the failure did not contribute to the jury's verdict, we must reverse the judgment. (*People* v. *Modesto* (1967) 66 Cal.2d 695, 712 [59 Cal.Rptr. 124, 427 P.2d 788].) As the California Supreme Court said in *In re Ferguson, supra,* 5 Cal.3d 525, 533: "In considering the materiality of the evidence [and whether prejudicial error occurred], we must look to the entire record because materiality can only be determined in the light of the circumstances. Thus we must consider not only the other evidence of guilt but also any other defense evidence which might have caused a different verdict. In addition, where, as here, it is apparent that the disclosure of the evidence concealed would have logically led to other evidence, such other evidence which has been found since the trial must also be considered. The basis of the rule requiring disclosure by the prosecution, as we have seen, is that the defendant may otherwise be deprived of a fair trial, and thus we must consider all of the matters bearing on the ultimate question of the fairness of the trial."

At this point, it is appropriate to note that the facts of this case are distinguishable from the facts before the court in the *Ruthford* opinion. In *Ruthford,* Thomas' testimony was elicited through the district attorney's efforts to procure a lenient sentence for the witness' wife; here, the district attorney and his deputy steadfastly denied that they had made any offers in exchange for Robison's testimony. Also in *Ruthford,* the prosecutor affirmatively contributed to the deception when he told the judge presiding at Ruthford's trial, "No. There is no immunity. [Thomas] is convicted, I think, of 10 counts. *There was no promise made to him.*" (*Supra,* 14 Cal.3d at p. 405, fn. 2.) In the instant case, the record suggests that the prosecutor's failure to clarify Robison's misleading testimony may have been inadvertent.

 We do not believe that these distinctions are significant. (See *People* v. *Ruthford, supra,* 14 Cal.3d 399, 406.) As we see it, the decisions we have reviewed lead, inescapably, to the following rules. Where, as here, two or more persons are accused, and then charged, of complicity in the same offense, and where the district attorney plans to call one of them as a prosecution witness, he must disclose to all other defendants any offer he has made to the prospective witness concerning a plea of

guilty to a lesser offense, or other lenient treatment, regardless of his reasons for making the offer. The district attorney also must disclose to all defendants any discussions he may have had with the potential witness as to the possibility of leniency in exchange for favorable testimony even though no offer actually was made or accepted. ■ Second, the district attorney must correct any false or misleading impression that he knows a prosecution witness has created as to discussions or offers of leniency, or other inducements for testifying, regardless as to whether he has any affirmative part in creating the false or misleading impressions.

■ Stated in another manner, whenever the district attorney offers one of several persons accused of complicity in the same criminal offense the opportunity to plead guilty to a lesser offense or engages in discussions with his attorney concerning the possibility of leniency, and later the accused appears as a prosecution witness at the trial of the other defendants, both the witness and the district attorney are subject to the accusation that offers of leniency were made in exchange for favorable testimony. If such a charge is made at the trial, and if there is a conflict in the evidence on this issue, it is up to the jury to resolve the conflict and then to judge the credibility of the prosecution witness accordingly. To hold otherwise would lead to post-trial charges and countercharges and, what is worse, could pave the way to the type of double talk which ultimately could lead to the circumvention of the disclosure rules which have evolved to insure a fair trial to all persons accused of crime.

Because there is a probability of another trial, we next consider appellants' contention that the prosecution failed to sustain its burden of justifying the warrantless police seizure of the beads found in the backyard of the residence abutting the rear of Bramlette's apartment.

After Connie Johnston was admitted to the hospital, she informed Officer John Howard that the kidnapers had taken her purse; she explained that her purse was decorated with large blue beads and small white beads. Then on May 29, 1973, Officer Maurice Higgins informed Howard that after Robison's arrest, Robison told Higgins that Bramlette had taken the victim's blue and white beaded purse, torn the purse up and thrown the beads over a fence behind her apartment.

On the following day Officers Higgins and Howard went to a machine shop that adjoined a portion of the fence behind the Bramlette apartment. The officers carefully explored the area near the fence and discovered nothing; they then were called away on other police business

and were unable, at that time, to commence a survey of the back yard of a residence and a trailer park that also abutted the fence behind the apartment.

On May 31, Officer Howard, in the company of Officer Ward, returned to the area and obtained the consent of the owner of the trailer park to look for the beads on the trailer park property; the search proved fruitless. Then Howard looked over a four-foot high picket fence which separated the trailer park from the backyard of the next door residence, and he observed six or seven large blue beads on the top of the grass and weeds in the backyard.

The officer immediately proceeded to the front door of the residence to obtain the occupant's consent to enter the back yard. After knocking on the door, and receiving no reply, a neighbor informed Howard that the occupant of the residence was at work. The officer proceeded down a driveway and through a 20-foot wide unfenced opening that led directly into the back yard where the beads were located. Once in the back yard, he observed numerous large blue beads and small white beads. Thereafter, a police technical investigation unit was called to the scene; the location was photographed, and the beads were seized as evidence.

■■ Appellants' constitutional attack upon the seizure of the beads has two prongs: first, appellants argue that the warrantless seizure was unjustified because it was "planned" in the sense that the discovery was anticipated and that the police knew in advance the location of the evidence and intended to seize it; and second, appellants insist that if the seizure were not "planned," there were no exigent circumstances that necessitated the warrantless seizure once the beads were discovered in plain view.

There is some merit to the contention that a warrantless seizure of evidence in plain view is unjustified when the evidence is not discovered during the execution of a valid search warrant or incident to valid arrest but is seized because the police knew in advance where it was located. (*Coolidge* v. *New Hampshire* (1971) 403 U.S. 443, 465-466, 470 [29 L.Ed.2d 564, 582-583, 585-586, 91 S.Ct. 2022, 2037-2038, 2040].) This is not such a case.

Before leaving the police station, the officers did not know the exact location of the beads; they knew only that the beads might be found in a general location around the fence behind Bramlette's apartment, and this area extended over three contiguous lots. In addition, the officers could not have anticipated that the beads would be in plain view nor did

they contemplate trespassing on private property in order to find them; before entering the trailer park the officers procured the occupant's consent and when they spotted the beads in the backyard of the neighboring residence, they immediately attempted to obtain the consent of the occupant of that residence.

We turn to appellants' second point, that there were no exigent circumstances justifying the seizure of the beads without a warrant even though they were in plain view.

■ It is true that a backyard is an area that is protected from unreasonable governmental intrusion by a warrantless search. (*Vidaurri v. Superior Court* (1970) 13 Cal.App.3d 550, 553 [91 Cal.Rptr. 704].) But a police entry into a backyard without a warrant requires less demanding urgency than a warrantless police entry into a house, office or other building. (*People v. Dumas* (1973) 9 Cal.3d 871, 882, fns. 8 and 9 [109 Cal.Rptr. 304, 512 P.2d 1208].) ■ And in judging the reasonableness of a warrantless seizure of items of potential evidence that will aid in a conviction, the factors to be considered are the necessity to preserve potential evidence *and* ". . . the degree of invasion of other interests affected by the seizure . . . ." (*People v. Curley* (1970) 12 Cal.App.3d 732, 747 [90 Cal.Rptr. 783].)

■ Here the beads not only were abandoned by appellants, but the officers knew that they were material evidence in a serious crime. Also, the officers were at a place where they had the right to be when they saw the beads in plain view, and they attempted to obtain the occupant's consent before they entered the backyard through a 20-foot wide unfenced opening. At the time a dog was wandering around the back yard and children were playing nearby. When all of the circumstances are considered the officers' minor intrusion into the backyard of the residence to pick up critical evidence in plain view did not constitute the type of conduct proscribed by the authorities upon which appellants rely for the proposition that the warrantless seizure was unlawful in this case.

In a parting thrust, appellants rely upon the *Harvey-Madden* rule (*People v. Madden* (1970) 2 Cal.3d 1017, 1021 [88 Cal.Rptr. 171, 471 P.2d 971]; *People v. Harvey* (1958) 156 Cal.App.2d 516, 523 [319 P.2d 689]) to claim that the seizure of the beads was unlawful. They complain because Officer Howard was told by Officer Higgins that Robison had said that the beads were thrown over a fence in the area adjacent to the rear of Bramlette's apartment and because neither Higgins nor Robison testified at the suppression hearing. This deficiency in the evidence can be cured on retrial.

We do not reach the many other questions raised by appellants in this appeal; the answers to these questions largely will rest upon the evidence presented at retrial or upon the discretion vested in the trial judge.[3]

The judgments in 5 Criminal No. 1843 are, and each of them is, reversed.

The writ in 5 Criminal No. 2556 is granted. Petitioner Ronnie Lynn Westmoreland is remanded to the custody of the Superior Court of Kern County for further proceedings in accordance with the views expressed in this opinion.

The writ in 5 Criminal No. 2557 is granted. Petitioner Charlene Sue Easley is remanded to the custody of the Superior Court of Kern County for further proceedings in accordance with the views expressed in this opinion.

The writ in 5 Criminal No. 2562 is granted. Petitioner Shirley Ellen Bramlette is remanded to the custody of the Superior Court of Kern County for further proceedings in accordance with the views expressed in this opinion.

Brown (G. A.), P. J., and Franson, J., concurred.

A petition for a rehearing was denied June 3, 1976, and the opinion was modified to read as printed above. Respondent's petition for a hearing by the Supreme Court was denied July 21, 1976.

---

[3]Appellants also attack the constitutionality of the punishment of life in prison without possibility of parole imposed upon their convictions of kidnaping for the purpose of robbery with bodily injury. We note that a similar contention presently is before the California Supreme Court in the case of *People* v. *Ladara* (Crim. 19352, hg. granted Apr. 15, 1976).