[No. B008838. Second Dist., Div. Two. Sept. 5, 1985.]

In re REGINALD C., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
REGINALD C., Defendant and Appellant.

COUNSEL

John E. deBrauwere for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Gary R. Hahn and Linda C. Johnson, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**GATES, J.**—Following a determination that he had carried a concealed dagger upon his person, Reginald C. appeals from an order that declared him a ward of the court, but allowed him to remain at home with his parents. (See Pen. Code, § 12020, subd. (a).) He contends:

"A. The court's recall of the police officer to testify further after the prosecution had submitted its case and after the police officer had been a party to the colloquy between the court, the prosecution and defense counsel was error. B. The pat-down performed on appellant by Officer Stocks was done without probable cause and exceeded the scope of a detention search. C. The incorporation of all testimony and evidence adduced at the [Welfare and Institutions Code, section] 700.1 hearing into the adjudication hearing record was error because there was no knowing waiver by the juvenile of his constitutional rights."

The determinative facts were undisputed. On May 28, 1984, Jill Bogan, a security agent at Nordstrom's department store located in the Glendale Galleria, had conducted a surveillance of appellant and another minor after she had been informed by sales personnel that the two youths had been in the store the previous day looking at expensive merchandise but refusing assistance. She observed appellant, apparently acting as a lookout, "watching the salespeople and customers in the area" after his companion, Jimmy L., "had selected several pairs of expensive tennis wear and had gone into the fitting room." After L. had exited he hung up certain of the pieces he had removed from the rack but when Bogan checked the fitting room he had used, she discovered "several empty hangers," suggesting that other items had been stolen.

Bogan followed the two youths from Nordstrom's to the Broadway store, also located in the Galleria. There she watched as this time appellant's companion took a turn as lookout while appellant entered a stockroom that was closed to the public. Though Bogan attempted to contact a Broadway official, she had not succeeded in doing so before Officer Mark Stocks of

the Glendale Police Department arrived on the scene in response to her earlier call. Bogan, who was known to Stocks, advised him of what had transpired and her belief that the two youths had stolen Nordstrom's property.[1]

When appellant came out of the stockroom, his companion L. exited the building itself but was immediately stopped by Officer Stocks' partner. Appellant had started to follow L. out the same doorway but when he looked outside and saw L. in the custody of a police officer, appellant promptly "turned around and began to reenter the store." At this point Officer Stocks approached and advised appellant he was being detained in connection with his possible shoplifting. In addition, because appellant "was wearing a jacket and the jacket was almost entirely all the way zipped up and [although the store itself was airconditioned] the temperature outside that day was very hot, 95 degrees," the officer concluded it was advisable to pat the jacket to be certain appellant was not in possession of a lethal weapon. When he did so Officer Stocks immediately detected the dagger appellant carried concealed in his waistband.

Juvenile proceedings should, so far as is compatible with due process, strive to maintain that informal character that has always been their laudable goal (*In re Winship* (1970) 397 U.S. 358, 366-367 [25 L.Ed.2d 368, 377, 90 S.Ct. 1068]; *In re Gault* (1967) 387 U.S. 1, 27 [18 L.Ed.2d 527, 545-546, 87 S.Ct. 1428]) to the end that the truth regarding the subject minor's conduct may be ascertained, and, if necessary, appropriate steps taken to nip budding character defects before they blossom into adult criminal behavior. Lamentably, however, as so often is the case today, the processing of the instant petition ignored the appellant and concentrated solely on an arcane effort to classify and pigeonhole Officer Stocks' actions.

In the light of the uncontested facts it would seem clear that the officer was entirely justified in touching the exterior of appellant's zipped-up jacket before proceeding with his investigation in order to guard against a very real danger which, in fact, existed. (See *Terry* v. *Ohio* (1968) 392 U.S. 1, 23 et seq. [20 L.Ed.2d 889, 907 et seq., 88 S.Ct. 1868].)

Unfortunately, rather than so holding, the trial court concluded that certain unspecified appellate decisions required it to reach a contrary conclusion. That is, it announced its belief to be that unless there existed probable cause to "arrest,". rather than merely to "detain," the superficial frisk

---

[1]Appellant's probation report which is included in our clerk's transcript states that L. "was discovered wearing stolen merchandise" but such fact was not developed during appellant's hearing.

which had disclosed the presence of appellant's deadly weapon had been an improper, albeit most providential, action. Nonetheless, it continued, in light of the undisputed evidence regarding Officer Stocks' own observations, and the detailed report given him by the security agent Bogan, there existed a reasonable basis for believing a crime had been committed.

The court still remained concerned, however, since Officer Stocks had declared it had not been his intention to effect a formal arrest prior to completing his investigation. The officer's anticipated sequence of events was, of course, both understandable and commendable, i.e., rarely will it be the wisest or most economical course of action to transport and "book" even the most strongly suspected criminal until at least some effort has been made to determine whether or not his apparent crime was actually consummated.

Therefore, over the quite impassioned objections of appellant's trial counsel,[2] the court recalled Officer Stocks as its own witness in order to assure

[2]This extended causerie included a number of sharp exchanges: "THE COURT: Well, that's where I don't think he [Officer Stocks] ever specifically said whether—what the subjective beliefs were due to the fact that none of us asked him the question. [¶] I asked him whether he was going to [arrest] and that was different than whether he believed he had the right to. [¶] And evidently that's the test here. [¶] He believes he has a right to arrest him and he doesn't have to arrest him. And if the objective standards are there, then the search is valid. [¶] MR. TAGUCHI [defense counsel]: Your Honor, I'm going to object to the recalling of the officer. [¶] The People have the burden of proving the lawful seizure of this evidence. They rested. [¶] And after, it's kind of like a granting of an 1118 motion. And then have the People say, 'Well, oh, I forgot. Let me put on the officer again.' [¶] That's what is happening here. We have an experienced prosecutor who understands what the law is. [¶] I am not under any obligation to ask the witness the question. The prosecutor is under the obligation to ask that question. [¶] THE COURT: I'm interested in searching for the truth. [¶] MR. TAGUCHI: Well, the search for the truth is based on what the People have an obligation to do. They have failed to do that. [¶] And now the court is going to call the officer to try to flush it out. [¶] THE COURT: I'm not trying to flush it out. I think he'll tell us the truth, because I think he has shown that he tells the truth very candidly. [¶] It may come out in favor—I just don't know. [¶] The only thing I could think of is, even though I kind of told you that I don't believe there was a valid patdown the last time, I just cut people off because I have been cut off by judges and I felt—I have been cut off too many times by judges and all of a sudden they rule on something I haven't even thought about. . . . [¶] I'm going to recall the officer myself since he's here. [¶] MR. TAGUCHI: Object for the record. [¶] THE COURT: All right. [¶] MR. TAGUCHI: Motion to strike any further testimony of the officer. [¶] Could I have a ruling on that, Your Honor? [¶] THE COURT: Well, you can't have a motion to strike because he hasn't said anything yet. [¶] But you are objecting to the officer testifying and that objection is overruled. [¶] Which shouldn't come as a surprise since I called him."
Following the officer's testimony the following is reported: "THE COURT: Any further cross-examination? [¶] MR. TAGUCHI: No. [¶] Motion to strike for the reason previously indicated. [¶] THE COURT: That motion is overruled. [¶] Okay. You may stand down. [¶] THE WITNESS: Thank you. [¶] THE COURT: Any further argument? [¶] At least the record is clear as to what we are doing. [¶] MR. TAGUCHI: I'm really kind of shocked that this is occurring. It's analogous to argument on 1118.1 motion, and then having the court say, 'Well, I kind of agree with you, so in the search for truth I'll let the prosecutor call a witness, fill out the corpus.' [¶] And that's just plainly improper. [¶] And I have no further

itself that not only had there existed objective grounds to justify an arrest, but further that the officer, "subjectively," had been aware thereof. Anticipatably, this seven-year veteran confirmed his knowledge of the law and his ability to draw reasonable inferences from known data.

■ Appellant's initial contention that the court should not have examined Officer Stocks further in order to enlighten itself on a point it considered significant, necessarily fails. It is true, of course, that, wisely or unwisely, most of the maze-like rules that now enmesh our penal system have been injected, bit by bit, into juvenile wardship proceedings. (See *In re Issac G.* (1979) 93 Cal.App.3d 917, 920-921 [156 Cal.Rptr. 123]; *In re Michael S.* (1983) 141 Cal.App.3d 814, 818 [190 Cal.Rptr. 585].) Nonetheless, even in our most vexed adult forum, reality has not been declared anathema.

An adversary system, despite its acknowledged shortcomings as a method for ascertaining the truth, has much to commend it whenever there are sincerely disputed questions of guilt or innocence to be resolved.[3] Where,

---

comment. [¶] THE COURT: Mr. Taguchi, do you have some authority to say—to show that what I have done is wrong? [¶] MR. TAGUCHI: The prosecutor has rested. [¶] THE COURT: I understand that. [¶] Do you have some authority, some case authority to show what I have done is wrong? [¶] MR. TAGUCHI: Yes. [¶] I want to cite the United States Constitution and the California Constitution. [¶] THE COURT: Do you have some specific case or something to show that I cannot reopen the case to find the truth? [¶] Do you have something to show that once the prosecution has rested that we are bound with the state of the law then, and I have to interpret—[¶] The fact that I'm not sure how I interpret what I have heard anyway, but if you have something to show that I can't do that, and I'll listen to you and strike his testimony if you have something to show that. [¶] And if you want to have more time, I'll give you more time, even to tomorrow if you want. [¶] MR. TAGUCHI: What I do want to point out is that the court is violating the separation of its power and not fulfilling its judicial responsibility by acting like a prosecutor in this case."

The proceedings ended in this manner: "THE COURT: Okay. I am going to deny your 700.1 motion. [¶] MR. BUDMAN [Deputy District Attorney]: I had spoken to Mr. Taguchi this morning, and we have agreed that we would incorporate all testimony and evidence that's been adduced at the 700.1 hearing by reference into the adjudication. [¶] THE COURT: All right. Do you have any further witnesses? [¶] MR. BUDMAN: No, but I would like to ask at this point that the knife that was previously marked for People's 1 as identification yesterday now be received in evidence. [¶] THE COURT: So received. [¶] MR. BUDMAN: People rest. [¶] THE COURT: Mr. Taguchi. [¶] MR. TAGUCHI: No defense. [¶] THE COURT: The only question I have, if it's a knife over a certain length, then it's a dangerous weapon or what? [¶] MR. TAGUCHI: I am not here to educate the Court on the law. The Court is under obligation sua sponte to take judicial notice of 12020. [¶] THE COURT: Is there any issue with respect to that? [¶] MR. TAGUCHI: Submitted."

[3]Even here, however, it has been stressed that "The search for truth is not served but hindered by the concealment of relevant and material evidence. Although our system of administering criminal justice is adversary in nature, a trial is not a game. Its ultimate goal is the ascertainment of truth, and where furtherance of the adversary system comes in conflict with the ultimate goal, the adversary system must give way to reasonable restraints designed to further that goal. . . ." (*In re Ferguson* (1971) 5 Cal.3d 525, 531 [96 Cal.Rptr. 594, 487 P.2d 1234].) ". . . 'Our courts are not gambling halls but forums for the discovery of the truth.'" (*People* v. *Geiger* (1984) 35 Cal.3d 510, 520 [199 Cal.Rptr. 45, 674 P.2d 1303].)

however, the only issue before a court is whether or not it should subject society to the self-immolation of the exclusionary rule in order to penalize, and thereby hopefully to educate, an offending officer and inspire him to improve (*People* v. *Lara* (1980) 108 Cal.App.3d 237, 241 [166 Cal.Rptr. 475]), it behooves every trial judge to do his utmost to determine *exactly what it was the officer did*.

The high price our citizens must pay whenever we in the judiciary blind ourselves to the truth, should never be exacted merely because counsel have failed to ask sufficient appropriate questions. No possible gain occurs when (1) a court refuses to consider evidence acquired in a perfectly lawful manner, or (2) an officer is "punished" despite the complete propriety of his conduct, or (3) a youthful offender is misled concerning his countrymen's expectations of him by being spared the consequences of his own indisputably antisocial behavior. (See generally *United States* v. *Leon* (1984) 468 U.S. 897, — et seq. [82 L.Ed.2d 677, 696 et seq., 104 S.Ct. 3405].)

In sum, the court's determination here to fully satisfy itself as to the facts was entirely correct; any other course of action would have constituted an inappropriate abandonment of its responsibilities.

■ " '. . . "It apparently cannot be repeated too often for the guidance of a part of the legal profession that a judge is not a mere umpire presiding over a contest of wits between professional opponents, but a judicial officer entrusted with the grave task of determining where justice lies under the law and the facts between the parties who have sought the protection of our courts. Within reasonable limits, it is not only the right but the duty of a trial judge to clearly bring out the facts so that the important functions of his office may be fairly and justly performed." [Citation.]' " (*People* v. *Carlucci* (1979) 23 Cal.3d 249, 256 [152 Cal.Rptr. 439, 590 P.2d 15].)

■ Appellant's final contention derives from the fact that, as the trial court announced at the outset, "This is the matter of Reginald C. . . . And this is set today for an adjudication, also for a 700.1 hearing . . . ." Since the same judge was to hear both issues essentially simultaneously, there obviously was nothing to be achieved by having the witnesses redundantly repeat their testimony twice before the same trier of fact. That defense counsel agreed to this sound approach and, thereafter, appellant chose to rest at the close of the combined hearing, in no way rendered this proceeding analogous to the submission of a criminal case in the superior court upon the transcript of an accused's preliminary examination in a municipal court or upon some other form of written record made at an earlier time in a different forum. In any event, since appellant's possession of a concealed

dagger was an uncontested and incontestable fact, no possible prejudice resulted from the adoption of a dual format.

The judgment is affirmed.

Roth, P. J., and Beach, J., concurred.