[Civ. No. 19185. Third Dist. Jan. 30, 1981.]

In re GARY G., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
GARY G., Defendant and Appellant.

**COUNSEL**

Eric J. Coffill and Quin Denvir, State Public Defender, under appointments by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Gregory W. Baugher and James Ching, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

CECCHETTINI, J.*—The minor, Gary G., was adjudged a ward of the court after it was found he had committed murder in the second degree. (Pen. Code, § 187.) He appeals, asserting (1) lack of substantial evidence to support the finding that he committed murder; (2) the court erred in limiting cross-examination of the victim's brother on the issue of bias; (3) an eyewitness identification of the minor as the perpetrator was tainted by suggestive circumstances leading to the identification; (4) prosecutorial misconduct; (5) his motion for suppression of expert testimony was improperly denied; and (6) he did not receive appropriate discovery of investigative material.

We discuss each contention below and conclude that the judgment be affirmed.

FACTS

On July 18, 1979, Danny G., Charles P. and Vince E. walked to a residential development site near Charles' home. At the site, working inside some large drainage pipe sections, was Bill Williams. Williams' girl friend, Julie I., was also in the ditch, keeping him company while he worked. Charles and Vince approached the ditch and began throwing rocks at Julie. After a short period of time the three minors left the area. Vince went home and Danny and Charles went to Danny's house.

Thereafter, Charles and Danny met the minor (Danny's older brother) and informed him that someone was working in the drainage pipes at the residential site. The minor suggested they return to the site. Charles agreed, as he wanted to throw more rocks at Julie.

While walking to the site, Charles noticed that the minor had a handgun tucked in the front of his pants. Charles inquired about the weapon; the minor pulled up his shirt and showed the gun to Charles. Upon reaching the site, Charles and the minor began throwing rocks into the open ditch. The minor pulled out the revolver and shot at a nearby generator; Charles then threw the generator into the ditch. Williams emerged from the pipe after the generator was thrown into the ditch. As Williams approached, Charles said, "I'm going to kill you." Williams responded, "Not if I kill you first." Charles started to run away,

---

*Assigned by the Chairperson of the Judicial Council.

at which time Williams climbed into a tractor and drove towards the minor. The minor fired once at Williams and the tractor went into the ditch. The minor jumped into the ditch and fired a second shot at Williams. He then pointed the gun at Julie, who ran from the scene. As the minor and Charles left the area, the minor stated, "I think he's dead. I shot him."

The minor returned home, borrowed the family car and drove Danny, Charles and Vincent to a liquor store. Upon returning from the store, the group was informed that the police were looking for them. Charles and Vincent exited the car and the minor and Danny drove away. Danny did not return home until several days later on July 24. The minor did not return home until August 17, at which time he surrendered to the authorities.

In his defense, the minor testified that he was in Sacramento until 8 p.m. on the day of the murder. His alibi was corroborated by his brother Richard and a friend Melencio T. The minor asserts he did not turn himself in after learning of the shooting as he feared he would be shot by the police.

I

The minor asserts the evidence presented is insufficient to support the finding that he committed the offense. We disagree.

In reviewing the determination by the court, we view the evidence in the light most favorable to respondent and presume in support thereof the existence of every fact the court could reasonably deduce from the evidence. (*People* v. *Vann* (1974) 12 Cal.3d 220, 225 [115 Cal.Rptr. 352, 524 P.2d 824].) The test is whether there is substantial evidence to support the conclusion of the juvenile court. (*In re John S.* (1978) 83 Cal.App.3d 285, 293-294 [147 Cal.Rptr. 771].)

Stripped to its essentials, the minor merely asserts that the court should have discredited the testimony of the witnesses presented by the People and, in turn, should have accepted his alibi defense which was corroborated by his brother Richard and his friend Melencio. The juvenile court resolved this conflict in the evidence in favor of the witnesses for the People; it is not now within our province to reweigh the evidence or resolve conflicts therein in favor of the minor. "The credibility of the witnesses and the weight to be given their testimony are

committed exclusively to the trier of fact." (*People* v. *Flummerfelt* (1957) 153 Cal.App.2d 104, 106 [313 P.2d 912].)

Upon resolution of the issue of credibility, the overwhelming evidence points to the minor as the perpetrator. Williams died from two gunshot wounds, both inflicted by a .38 caliber weapon, "probably a revolver." The minor had shown Charles a .38 caliber revolver moments before the shooting. Julie made a positive identification of the minor as the person who fired two shots at Williams. At the time of the incident, Julie was only a short distance from both Williams and the minor. Upon leaving the scene, the minor stated to Charles, "I think he's dead. I shot him." The minor's brother Danny, who was near the construction site, told his friends that "they" had just shot someone in the field and, while driving to the liquor store, the minor again admitted shooting Williams. Contrary to the minor's assertion, there is nothing in the record indicating that Charles', Julie's or the testimony of any other witness presented by the People was inherently improbable and thus legally unbelievable. (See *People* v. *Mayberry* (1975) 15 Cal.3d 143, 150 [125 Cal.Rptr. 745, 542 P.2d 1337].)

Substantial evidence supports the finding that the minor committed the murder.

## II

■ The minor asserts the juvenile court erred in not permitting him to cross-examine the victim's brother, Arval Williams, concerning whether or not Arval was a member of the Aryan Brotherhood. He asserts that members of that group are biased against Mexican-Americans; thus questioning directed toward Arval's possible prejudice was proper and should have been permitted.

While refusal to permit cross-examination of a prosecuting witness can constitute reversible error (see *People* v. *James* (1976) 56 Cal. App.3d 876, 887 [128 Cal.Rptr. 733]; *People* v. *Grantham* (1972) 26 Cal.App.3d 661, 666 [103 Cal.Rptr. 262]), no error was committed herein. Arval's testimony was directed solely to events which transpired both before and after the incident and included a description of the type of work his brother was engaged in at the site, a description of the site itself and his discovery of his brother's body. Arval's testimony did not deal with the minor or the dynamics of the crime and the court thus properly restricted the cross-examination.

## III

█ The minor asserts the juvenile court erred in denying his motion for mistrial on the basis of prosecutorial misconduct. Counsel made the motion after both sides had rested and based it on the total record of the proceedings. No specific grounds were included in the motion. It was denied without comment. He asserts the district attorney attempted to prejudice the court by bringing to the court's attention the fact that the minor's father was facing criminal charges. While the district attorney did, on a couple of occasions and in different contexts, bring this fact to the court's attention, so too did counsel for the minor. There is nothing in the record to indicate, however, that any of the district attorney's comments in this regard were made with the intent to sway the court in its disposition of the case, or that the court was influenced.

█ The minor also asserts misconduct occurred when the district attorney expressed his personal opinion to the court as to the veracity of a witness for the defense. We agree that such an expression of personal opinion amounts to misconduct. (See *People* v. *Perez* (1962) 58 Cal.2d 229, 245 [23 Cal.Rptr. 569, 373 P.2d 617, 3 A.L.R.3d 946].) In order to state a case of misconduct sufficient to warrant reversal, however, it is incumbent upon the minor to demonstrate prejudice resulting from the misconduct. (*People* v. *Bolton* (1979) 23 Cal.3d 208, 214 [152 Cal. Rptr. 141, 589 P.2d 396].) Here the hearing was in front of a judge, not a jury. (Cf. *ibid.*) The minor has not shown, nor does the record in any way demonstrate, any prejudice to him attributable to the remarks made by the district attorney. The contention must be rejected.

## IV

█ The minor asserts Julie's in-court identification of him as the perpetrator was tainted by a prior out-of-court identification. Prior to testifying, Julie observed the minor being led into the courtroom. At that time, the minor was handcuffed. The minor asserts the confrontation was so impermissively suggestive as to taint the subsequent in-court identification. We cannot agree.

An in-court identification will be suppressed only if it appears that a prior identification procedure employed to secure it "was so impermissively suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (*Simmons* v. *United States* (1968) 390 U.S. 377, 384 [19 L.Ed.2d 1247, 1253, 88 S.Ct. 967]; *People* v. *Rodriguez*

(1977) 68 Cal.App.3d 874, 881 [137 Cal.Rptr. 594].) There is nothing in the record to indicate the hallway confrontation was "impermissively suggestive" or in any way affected the subsequent in-court identification. The hallway confrontation was not designed to give Julie a prehearing glance at the minor; rather, pursuant to an order excluding witnesses, Julie was waiting outside the courtroom until called to testify. While she was waiting in the hallway, the minor, dressed in street clothes, was brought into the courtroom. At that time Julie was unaware that the minor was in custody; more importantly, Julie testified she recognized the minor as the gunman *prior* to noticing that he was handcuffed. No unfairness resulted to the minor by way of the out-of-court identification; there was thus no reason to strike the subsequent in-court identification. (Cf. *People* v. *Hunt* (1977) 19 Cal.3d 888, 894 [140 Cal.Rptr. 651, 568 P.2d 376].)

V

■ The minor asserts error in the court's refusal to strike the testimony of a ballistics expert where the information provided by the expert had not been previously disclosed to the defense.

A search of the minor's bedroom disclosed five .38 caliber casings, marked "WCC 71."[1] Paul Dougherty, a ballistics expert, testified as to the meaning of "WCC 71." The minor thereafter moved to strike Dougherty's testimony, asserting the district attorney should have provided timely notice of its expert and the essence of his testimony.

We find the motion was properly denied as there was no bad faith on the part of the People regarding the delay in notifying the defense of the expert testimony. Due to certain rulings made by the court in regard to a previous expert called by the People, the district attorney found it necessary to seek additional expert testimony. Dougherty was first contacted by the People the afternoon prior to the day he testified. The minor's counsel was aware of what the People were attempting to prove and, in addition, had been informed by the district attorney that the People would try to bring in a ballistics expert. Counsel could have secured his own expert; in fact, the court offered to grant counsel time to do so, but counsel declined. There was no error in denying the mo-

---

[1]Dougherty testified "WCC 71" stood for Wenten Cartridge Company, 1971. According to Dougherty, such ammunition is manufactured for military use and is not generally available for commercial use.

tion to strike. (Cf. *People* v. *Seach* (1963) 215 Cal.App.2d 779, 785-786 [30 Cal.Rptr. 499].)

VI

■ The minor asserts he was denied due process by the failure of Officer Stewart to retain "rough interview notes" compiled when the officer interviewed Vince E., a witness at the hearing. The minor had obtained a discovery order which included all notes made by investigating officers; he now contends that failure to provide him with such discovery deprived him of due process.

Vince said that he did not hear the minor admit to shooting Williams nor did he tell Stewart that he had heard the minor make such a statement. In turn, Stewart testified that he interviewed Vince after the incident, at which time Vince made the above mentioned statement. Stewart had taken notes during the interview with Vince, but discarded them upon making a formal report which included verbatim some of the statements made by Vince during the interview. Stewart testified that it was a routine practice for him to discard such notes after using them to write up a final report. Although the minor had been provided a copy of the report, his counsel nonetheless moved to strike that part of Stewart's testimony relating to the interview notes, asserting this sanction was necessary as a result of the officer's discarding discoverable evidence. The motion was denied by the court.

■ "It is clear that the Constitution does not require the prosecution to make a complete and detailed accounting to the defendant of all police investigatory work on a case." (*People* v. *Nation* (1980) 26 Cal.3d 169, 175 [161 Cal.Rptr. 299, 604 P.2d 1051].) It is equally clear, however, that due process does require the prosecution to disclose all material evidence favorable to the accused whether such evidence relates directly to the issue of guilt or can lead the defense to favorable evidence. (*In re Ferguson* (1971) 5 Cal.3d 525, 532 [96 Cal.Rptr. 594, 487 P.2d 1234]; see *Brady* v. *Maryland* (1963) 373 U.S. 83, 87 [10 L.Ed.2d 215, 218, 83 S.Ct. 1194].) Furthermore, it has been held that the obligation to disclose the existence of material evidence places on the state a correlative duty to preserve such evidence even without a request therefor, and law enforcement agencies must take reasonable measures to insure adequate preservation of such evidence. (*People* v. *Hitch* (1974) 12 Cal.3d 641, 650 [117 Cal.Rptr. 9, 527 P.2d 361]; see *United States* v. *Bryant* (D.C. Cir. 1971) 439 F.2d 642, 651.)

■ The above mentioned guidelines do not require the rough interview notes taken by investigating officers be preserved for discovery purposes. In addressing this same issue, the court in *People v. Dickerson* (1969) 270 Cal.App.2d 352 [75 Cal.Rptr. 828], commented: "To support such a contention the defense must mean that in connection with any investigation of an alleged crime, everybody carrying on such an investigation must preserve rough notes made for the purpose of ensuring accuracy of their official reports and deliver them upon request to defense counsel in order to give possible grounds for cross-examination of such witnesses; no such rule has ever been propounded; it seems to us that it seeks to carry to a ridiculous extreme the enunciation of 'rights of accused criminals.'" (*Id.*, at p. 360.) We concur with this appraisal.

This is not to say that such notes are never discoverable; indeed, should such notes still be in existence at the time a discovery order is made they should be turned over as part of the overall discovery package. (*People v. Torres* (1971) 19 Cal.App.3d 724, 731 [97 Cal.Rptr. 139].) We simply refuse to impose a judicial mandate that requires in each and every instance all original notes taken during the investigatory process be retained. (See *ibid.*) Where an officer testifies that he made an accurate report based on the interview notes and thereafter a copy of the report is given to opposing counsel, there can be no cause to complain that all required discovery materials have not been provided and certainly no basis for requiring the officer's testimony be excluded as a result of inability to produce such notes.

Here the minor does not charge, nor did the court find, that the notes were discarded in bad faith (i.e., for some ulterior motive other than that they had served their intended purpose), nor does he point to any reasonable likelihood that the report in any way varied from the original notes taken. Yet by seeking to have the officer's testimony stricken, the minor nonetheless implies bad faith or error by way of the officer's having discarded the notes. Without any showing, we refuse to accede to such implication. While in some instances the failure to produce original notes taken during the investigatory process may arguably affect the *weight* to be given testimony concerning them, the inability to produce such notes does not make the testimony concerning what was said inadmissible. (*People v. Torres, supra*, 19 Cal.App.3d at p. 731.) The privilege of discovery presupposes something to discover. Source or backup material are not always available physically or because of privilege. But unavailability alone does not infer erroneous or false

transcription of one's notes, whether those of a policeman, attorney or student.

The minor would argue that simply destroying, losing, misplacing, shredding, or otherwise discarding raw or rough notes creates an implication that there was error or fraud in the transcription of the same into a report or other memorial. Logic and common sense dictate otherwise. One could as logically say the written memorial prepared from the notes is more deliberate and dispassionate and thus more reliable. Neither inference is a rational conclusion from the bare act. At the very least, there should be a showing of some error or bad faith, as well as a showing that the material sought to be discovered constitutes significant evidence.

We are not oblivious to recent decisions emanating from the federal courts which, pursuant to *Brady* v. *Maryland, supra,* 373 U.S. 83[2] and *United States* v. *Bryant, supra,* 439 F.2d 642,[3] hold that officers must retain the rough notes taken during the course of an investigation (see e.g., *United States* v. *Harris* (9th Cir. 1976) 543 F.2d 1247, 1252-1253; *United States* v. *Harrison* (D.C. Cir. 1975) 524 F.2d 421, 423; *United States* v. *Bundy* (D.C. Cir. 1972) 472 F.2d 1266, 1267); it is simply our opinion that neither *Brady, Bryant* nor due process compel such a result. This case is not at all like *Brady,* wherein the prosecution withheld information valuable to the defense. Nor are the facts herein similar to

---

[2]In *Brady,* the defendant and his companion Boblit were found guilty of murder in the first degree in separate trials and sentenced to death. At his trial Brady took the stand and admitted his participation in the crime, but claimed that Boblit had done the actual killing. Prior to trial, Brady's counsel had requested the prosecution permit him to examine Boblit's extrajudicial statements in their possession. In response to the request the prosecution had shown him several statements but withheld one in which Boblit admitted doing the actual killing. Brady discovered this after his trial. The high court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (*Brady* v. *Maryland* (1963) 373 U.S. 83, 87 [10 L.Ed.2d 215, 218, 83 S.Ct. 1194].)

[3]In *Bryant,* police authorities destroyed tape recordings of critical conversations allegedly occurring between the defendants and the narcotics agent who allegedly purchased heroin from the defendants. The court pointed out that the credibility of the agent was the key to the conviction and that while he may have testified in the utmost good faith, there was a possibility that he forgot some of the details or could not accurately reconstruct what went on. The court thus concluded that law enforcement agencies must take reasonable measures to ensure adequate preservation of evidence that might bear on the issue of guilt or innocence. (*United States* v. *Bryant* (D.C. Cir. 1971) 439 F.2d 642, 645-646, 648.)

those in *Bryant*, where tape recordings were destroyed and thus the primary evidence against the defendants rested on the recollection of an undercover agent concerning what had transpired at the recorded meetings. Here the notes, while not physically preserved, were essentially preserved by way of transcribing their essence onto the officer's formal report, which was then turned over by way of discovery. Nor does *People v. Hitch, supra*, 12 Cal.3d 641, which relied in great part on *Bryant*, compel such a result. The *Hitch* court merely held that an investigative agency involved in the administration of a chemical test of a driver's breath for alcoholic intoxication has a duty to preserve and disclose specimens taken in administering the test. (*Hitch*, at pp. 647-648.) Thus, the essence of *Hitch* is that there is a "duty to undertake reasonable efforts to preserve the material evidence" which may affect the guilt or innocence of the defendant. (*Id.*, at p. 650.) ■■ Investigative notes do not necessarily fall into the category of material evidence bearing directly on an accused's guilt or innocence. Where such notes are incorporated into a formal report, where the officer testifies that the report accurately contains the substance of the information recorded on the notes, and when the report is thereafter turned over to the other side, the requirement of providing all discoverable evidence has been met; due process requires nothing more. (See *People v. Torres, supra*, 19 Cal.App.3d at p. 731; *People v. Dickerson, supra*, 270 Cal.App.2d at pp. 359-360. See also *People v. Chambers* (1980) 108 Cal.App.3d 985 [166 Cal.Rptr. 815], where loss of tapes of telephone conversations of a defendant monitored by police was not a deprivation of a fair trial.)

■■ Finally, even if the court had struck the officer's testimony as it related to the discarded notes, such action would have had no bearing on the ultimate disposition of the case. Julie positively identified the minor as the perpetrator. Charles testified that the minor twice admitted the shooting. Further, Vince's testimony was both evasive and suspect, leading us to conclude that there was little need to attack his credibility through Officer Stewart. Thus, the most that could be said for the officer's testimony as it related to the interview with Vince was that it was both cumulative and unnecessary. Not only has the minor failed to make any showing of substantial materiality (see *People v. Hitch, supra*, 12 Cal.3d at pp. 645, 649-653; *People v. Ammons* (1980) 103 Cal. App.3d 20, 33 [162 Cal.Rptr. 772]), but we are convinced that a different result would not have attained if the court had agreed to strike the officer's testimony. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065]].)

The judgment (order adjudging the minor a ward of the court) is affirmed.

Paras, Acting P. J., concurred.

REYNOSO, J.—I concur in the result but dissent from that portion of the opinion which concludes that the original interview notes taken by investigating officers need not be preserved. Such notes are discoverable, says the majority, only if they exist. However, the officers are free to discard the interview notes when the "formal report" is made. In so many cases, as in the case at bar, the minor's recollection of important portions of the conversation differs from the formal report, generally prepared some time after the conversation. The officer, often and quite naturally, has no recollection independent of the report. Innocent mistakes can be made in transferring the conversation from the original notes to the formal report. This is particularly so since the final report includes more than summaries of conversations. Under the majority rule, there is no way to double-check for errors or inconsistencies. Manifestly, the more reliable reflector of the conversation are the notes contemporaneously made. We deal with an issue of truth-finding not bad faith.

What to do? The majority's response is that nothing need be done. I am persuaded that the approach taken by the federal cases, cited but rejected by the majority, is the reasonable judicial response under existing state law. Since the minor had the right to discover the notes, had they not been destroyed (*Funk* v. *Superior Court* (1959) 52 Cal.2d 423, 424 [340 P.2d 593]), the teaching of *People* v. *Hitch* (1974) 12 Cal.3d 641, 650 [117 Cal.Rptr. 9, 527 P.2d 361], applies. *Hitch*, in essence, mandates the preservation of evidence. Notes of the conversation come within California's definition of evidence (Evid. Code, § 140).

While the above legal analysis seems straightforward and controlling, the rationale, as explained in the federal cases, persuades further. "It seems too plain for argument that rough [interview] notes from any witness ... could prove ... material." (*United States* v. *Harrison* (D.C. Cir. 1975) 524 F.2d 421, 427.) "Although the agents are trained to include all pertinent information in the [formal] report, there is clearly room for misunderstanding or outright error whenever there is a transfer of information in this manner." (*Id.*, at pp. 427-428.) And the judicial role is explained. "Notes taken by FBI agents in interviews either with prospective government witnesses or, as in this case, with the

accused, constitute potentially discoverable materials. [Citations.] Since the routine disposal of potentially producible materials by the FBI amounts to a usurpation of the judicial function of determining what evidence must be produced in a criminal case, we hold that such original or rough interview notes must be preserved." (*United States* v. *Harris* (9th Cir. 1976) 543 F.2d 1247, 1248.)

Despite the strength of my sense that the majority misanalyzes California law in the interview notes issue, I concur in the result. I agree with the majority that, under the facts of this case, even if the court had struck the officer's testimony, the minor would not have benefitted.

I add this final note. Local and state police departments, like the FBI on the federal level, want to follow the rules in protecting society; if the law is made clear by the courts, the investigative practices of our police will be strengthened and the rights of the accused protected. These aims, of course, are not mutually exclusive but, in a democracy, mutually beneficial. Those institutions which protect all of us, law enforcement and the judiciary, are strengthened by rules which are clear and fair.[1]

**PARAS, Acting P. J.,** Concurring.—I cannot let the comments of our dissenting justice pass without expressing independent thoughts thereon.

The practice of discarding raw notes (including interview notes) used to record concurrently transpiring events is universal. A given newsman will make them at the scene of a news event as he interviews interested parties, makes observations, etc., will later dictate or write the event more formally, and will then discard the the notes as useless. A particular contractor will take notes during the inspection of a job site, later will use them to work up a formal bid, then will discard them. A teach-

---

[1]Lest there be a misunderstanding, I stress that we deal with *interview* notes and not all investigative notes as the concurring opinion suggests. Police *interview* notes, as the cases outline, are materially different than rough bench or architectural notes. Such police *interview* notes form a vital part of a criminal case; it is the role of the courts, not the investigators, to determine admissibility. We may analogize the problem with which we deal, in a broader sense, to the issues arising out of the Fourth Amendment of the United States Constitution. That amendment, in general, protects all citizens from government searches unless the police have obtained a search warrant. The search of a home may have been absolutely reasonable as an investigative effort, but the Constitution gives to a magistrate (and not an investigator) the role of determining reasonableness.

Fourth Amendment protection, like *interview*-note protection, is for all accused, those later found guilty as well as those later found innocent.

er will generate rough notes in the course of research to prepare a lecture, then destroy them when no longer needed. Lawyers, judges, investigators, doctors, secretaries, clergymen, educators, architects, interior decorators, salespersons, interviewers, and a host of other persons who produce written matter of any sort, often routinely commence their process by on-the-spot rough notes, sketches, and diagrams whose sole purpose is to facilitate later complete and meaningful products, and which are thereafter destroyed. Many such writings are incomprehensible and confusing except to those who make them, encompassing as they do one's personal version of abbreviations, symbols, signs, doodles, and meaningful (to the maker) hieroglyphics. Even the maker often no longer understands them after the passage of substantial time. Many are downright embarrassing to those who are self conscious regarding their personal manner of depicting or describing certain subjects, or abbreviating words; such persons consider notes of this kind highly personal, under no circumstances to be seen by others.

There are of course certain of us, metaphorical "pack rats," who never destroy or discard anything and consequently retain even the roughest of such notes. There are others who discard them purely out of a sense of neatness, reluctant to retain anything which has served its purpose. And there are those who discard them consciously because they do not want them observed by anyone else. What these varying types generally have in common, those who save and those who discard is an absence of guile. In the process of discarding, those who do so intend no deception. There is nothing sinister about their practice. They simply and reasonably feel that their ultimate product has been produced by fair and accurate means, and those means need no longer be preserved. My personal conclusion, based on the encounter of hundreds of such raw notes during 30 years experience at the bench and bar, is that they should routinely be destroyed, for they rarely aid in ascertaining truth, and more often than not generate confusion and consequent falsehood.

I am sure that the dissenter would never condemn this practice as it relates to judicial notes we take during oral argument, later to destroy after writing an opinion. I am equally certain he does not condemn the practice when done by the multitudes of others in other occupations. In my view, he should treat police officers the same. A distinction is not warranted.

Nor am I impressed by the argument that the federal rule accords with the dissenting view. The federal judiciary is entitled to its folly just as our state is entitled to its own (see e.g., *People* v. *Disbrow* (1976) 16 Cal.3d 101 [127 Cal.Rptr. 360, 545 P.2d 272].) Merely because federal authority refuses to treat police like other human beings does not mean that state authorities should do the same. The federal rule is no more sensible or reasonable because it is a federal rule than it would be as a state rule.

A petition for a rehearing was denied February 24, 1981. Reynoso, J., was of the opinion that the petition should be granted. Appellant's petition for a hearing by the Supreme Court was denied April 1, 1981. Bird, C. J., was of the opinion that the petition should be granted.