[Crim. No. 34075. Second Dist., Div. Five. May 11, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
STANLEY D. KEITH et al., Defendants and Appellants.

**COUNSEL**

Tibor I. Toczauer and Robert M. Nadel, under appointments by the Court of Appeal, for Defendants and Appellants.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, William R. Pounders, Edward T. Fogel, Jr., and Robert R. Anderson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

KAUS, P. J.— Defendants Stanley D. Keith and William Keith were charged with various sexual assaults, including forcible rape, forcible oral copulation and forcible sodomy. The victim was J.R., who was 15 years old at the time. The information included various peripheral charges, such as kidnaping and the use of a firearm. After a jury trial both Stanley and William were found guilty on two counts of forcible rape and two counts of forcible oral copulation. Stanley was found guilty on one count of sodomy and one count of kidnaping. In addition the jury found true that defendants voluntarily acted in concert with each other within the meaning of sections 264.1, 286, subdivision (d), and 288a, subdivision (d) of the Penal Code, and that Stanley did personally use a firearm. Both defendants appeal.

### FACTS

Since we have reached the conclusion that the judgment against both defendants must be reversed because of an erroneous key ruling by the trial court, a condensed statement of facts will suffice.

J.R., the 15-year-old victim,[1] testified that she had met defendants' brother Larry, who was 16 years old, through Larry's sisters. She had intercourse with Larry in January 1977, the first week she started going with him and again in August 1977. This second act of intercourse took place in a car in front of Larry's home and somehow resulted in sheriffs' deputies picking up J.R. and delivering her to her mother. J.R. then stopped dating Larry because her mother did not like him.

In the evening of March 19, 1978, Larry telephoned J.R. and said he wanted to take her out. She agreed to go with him and he arrived in a car. J.R. thought that she and Larry were going to the store to get a

---

[1]The case was tried as if there were no such crime as unlawful sexual intercourse. (Pen. Code, § 261.5.)

coke. Larry, however, drove to the Keith residence. Stanley and William emerged from the house, together with their sister Debbie and her husband Terry. Although William was usually confined to a wheelchair and hooked on to a respirator, he was able to walk and did so on this occasion. Everybody got into the car and Stanley started to drive. They promised to take J.R. home but instead, over her objections, drove first to a Seven-Eleven store where Larry purchased beer. J.R. tried to escape, but was caught by Stanley. The party then drove to Debbie's home which J.R. was forced to enter at the point of a gun, held by Stanley. Larry displayed a knife which he put to J.R.'s throat. Debbie and Terry went into their own room. Stanley, William and Larry then committed the various sexual assaults on J.R., all entirely against her will.[2] Eventually, after the three men had fallen asleep, J.R. escaped and called her mother from a gas station.

Except for the two occasions when she had intercourse with Larry in 1977, J.R. denied any prior sexual encounters with either defendant or Larry.

J.R.'s credibility came under severe attack. Skipping details and minor inconsistencies, J.R. admitted that her first reports to investigators were to the effect that Larry had kidnaped her at knife point from her home, that Stanley pointed his gun at her when they were at the Keith residence and that she screamed for assistance while the party was at the Seven-Eleven store. Her explanation for these admitted untruths was fear of her mother.

The defense, presented essentially through the testimony of Stanley, was that J.R. consented to all acts of sexual intercourse with both defendants as well as with Larry. The alleged acts of oral intercourse and sodomy were denied. Stanley admitted that he was armed with a gun and that both he and Larry had knives. He denied, however, that any of the weapons were displayed.[3]

## ISSUES

Only two issues need discussion. The first relates to a certain ruling by the trial court concerning the admissibility of evidence of J.R.'s prior

[2]Larry, a juvenile, was not charged in the same information. According to J.R., he forcibly raped her and sodomized her during an episode of forcible oral copulation with Stanley.

[3]William did not testify. Larry did testify but his testimony did not touch on the events of March 19, 1978.

sexual conduct. The second has to do with the erasure of a tape recording made by J.R. during a polygraph examination.

### *J.R.'s Sexual Conduct*

The framework for our discussion is section 1103 of the Evidence Code, quoted below, particularly subdivision (2) which provides, in brief, that in prosecutions for forcible rape, evidence of the complaining witness' sexual conduct is inadmissible to prove consent except where the evidence is "of the complaining witness' sexual conduct with the defendant."[4] A companion statute—section 782 of the Evidence Code—relating to the impeachment of the complaining witness, is pertinent to our discussion, but not as directly involved.

In brief, defendants claimed that neither section 782 nor section 1103 could bar them from introducing evidence of the following:

1. That Stanley and J.R. had consensual intercourse in the back of an El Camino truck in the summer of 1977. Larry was present and he, too, had intercourse, as did one Wayne Reed.

---

[4]Evidence Code section 1103 reads as follows: "(1) In a criminal action, evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by Section 1101 if such evidence is:

"(a) Offered by the defendant to prove conduct of the victim in conformity with such character or trait of character.

"(b) Offered by the prosecution to rebut evidence adduced by the defendant under subdivision (a).

"(2) (a) Notwithstanding any other provision of this code to the contrary, and except as provided in this subdivision, in any prosecution under Section 261, or 264.1 of the Penal Code, or for assault with intent to commit, attempt to commit, or conspiracy to commit a crime defined in any such section, opinion evidence, reputation evidence, and evidence of specific instances of the complaining witness' sexual conduct, or any of such evidence, is not admissible by the defendant in order to prove consent by the complaining witness.

"(b) Paragraph (a) of this subdivision shall not be applicable to evidence of the complaining witness' sexual conduct with the defendant

"(c) If the prosecutor introduces evidence, including testimony of a witness, or the complaining witness as a witness gives testimony, and such evidence or testimony relates to the complaining witness' sexual conduct, the defendant may cross-examine the witness who gives such testimony and offer relevant evidence limited specifically to the rebuttal of such evidence introduced by the prosecutor or given by the complaining witness.

"(d) Nothing in this subdivision shall be construed to make inadmissible any evidence offered to attack the credibility of the complaining witness as provided in Section

2. Some time before March 1978—defendants were quite inconsistent as to the date—J.R. had consensual intercourse with Larry, Stanley, William, their brother Alfred, Darryl Garrett, Richard Denny and George Vincent—not necessarily in that order. All acts took place on J.R.'s mother's waterbed.

3. Some time in June 1977, William, Larry, George Seiko and Curtis Seiko were at William's home. All except George had consensual intercourse with J.R.

The admissibility of this testimony was the subject of many motions, written and oral, stretching like an archipelago across 600 pages of transcript. What emerged, were two key rulings: (1) Evidence of intercourse by J.R. with anyone but defendants was inadmissible.[5] (2) Only defendants were competent to testify to the admissible instances of intercourse.[6] The impact of that ruling is best illustrated by its effect on the alleged orgy on J.R.'s mother's waterbed when J.R. supposedly had intercourse with seven men: as far as intercourse with four of them was concerned, no evidence was admissible, whatever its source. With respect to intercourse with defendants, Alfred Keith, Darryl Garrett, Richard Denny and George Vincent were incompetent as witnesses.

■ Although both rulings were wrong, the one which precluded anyone other than defendants or Larry from testifying to prior consensual intercourse with defendants was not only more clearly in error, but also more prejudicial. It was clearly in error for the simple reason that evidence of prior intercourse with defendants is expressly admissible pursuant to Evidence Code section 1103, subdivision (2)(b) and there just is no rule of law which restricts the source of the evidence to the accused.[7] The People attempt to minimize the error by assuming that no one but defendants would be able to testify whether prior acts of intercourse were consensual or coerced. Even if we grant this doubtful

---

782.

"(e) As used in this section, 'complaining witness' means the alleged victim of the crime charged, the prosecution of which is subject to this subdivision."

[5] At first Larry was not considered a defendant within the meaning of that ruling. The court later changed its mind. For the purpose of our discussion of the issue under consideration, the term "defendants" includes Larry.

[6] The court did rule that one defendant could testify to intercourse between J.R. and another defendant.

[7] If there were any such rule, the admissibility of evidence under section 1103, subdivision (2)(b) would always be subject to the accused's waiving his privilege against self-incrimination.

assumption, any force that argument might have in some situations completely misses the mark in this case, where J.R.'s position was that before March 19, 1978, she had not had intercourse of any kind—forcible or consensual—with any defendant except Larry.

The People's next argument assumes as its premise that the court ruled correctly in excluding testimony that anyone but defendants participated in the three encounters—the waterbed orgy, as well as the activities in the El Camino and at William's home. In brief, the People argue that if the other witnesses—Darryl Garrett, Richard Denny, George Vincent, Alfred Keith, Wayne Reed and the two Seikos[8]—had been permitted to testify that they witnessed acts of intercourse between J.R. and defendants without, however, testifying to their own participation, the testimony would either paint J.R. as a person who enjoyed voyeurs when she engaged in intercourse or cause the jury to speculate that the witnesses were more than just spectators—precisely what defendants offered but were not permitted to prove.

As we shall see, a mirror image of the People's argument leads us to the conclusion that the People's premise—the ruling excluding evidence of intercourse with anyone but a defendant—was in error. We therefore defer further comment.

Finally, the People assert that the court excluded testimony from witnesses other than defendants and Larry by exercising its discretion under section 352 of the Evidence Code. We disagree.

As already noted, the arguments concerning the admissibility of the evidence in question came up again and again. The People are quite correct in stating that relatively early in the trial the court relied on section 352. Yet, as we read the passages referred to, the court was discussing the admissibility of the evidence for the purpose of impeaching J.R. as a witness, rather than as proof of consent as permitted by section 1103, subdivision (2)(b). The final statement of the court's views was based entirely on its interpretation of section 1103 and had nothing to do with section 352.[9]

---

[8]It will be remembered that the court's ruling did not just affect the waterbed episode but also prevented Wayne Reed from testifying to the sexual activity with Stanley and Larry in the El Camino truck, and barred testimony from the Seikos concerning the events at William's home in June 1977.

[9]"It is the ruling of the Court *under what it considers to be the interpretation in this case of 1103 of the Evidence Code* that the defendants who are before us, Stanley

In any event, even if the trial court had purported to exclude the testimony of the witnesses in reliance on section 352, the ruling would have been a clear abuse of discretion. (*Thor* v. *Boska* (1974) 38 Cal. App.3d 558, 567 [113 Cal.Rptr. 296]; *People* v. *Mascarenas* (1971) 21 Cal.App.3d 660, 667 [98 Cal.Rptr. 728].) It can hardly be claimed that the evidence would have been confusing or misleading: as offered it would merely have paralleled the evidence offered by the defense, through Stanley. It would not have been cumulative since it would have emanated from somewhat less suspect sources. Nor is it arguable that the evidence would have been prejudicial to the People, except in the sense that it would have corroborated the defense version of the facts —hardly the type of prejudice to which section 352 refers. On the other hand the ruling which excluded relevant evidence, specifically admissible under section 1103, subdivision (2)(b), confined the defense to testimony from the most suspect source: defendants themselves—provided they waived their privilege not to testify—and Larry.[10] There can be no doubt that the error was prejudicial.

The other part of the court's ruling—that defendants could not prove consensual intercourse by J.R. with anyone but themselves—appears to rest squarely on the language of section 1103, subdivisions (2)(a) and (b) of the Evidence Code to the effect that specific instances of the alleged rape victim's sexual conduct are not admissible to prove consent, except where the sex partner is the defendant. It seems clear, however, that in framing this statute the Legislature was not thinking of situations where the defendants offer to prove, through other witnesses, that the complaining witness engaged in group sex with partners some but not all of whom are defendants. When that is the case section 356 of the Evidence Code may come into play. That section provides, in pertinent part, that "when a detached act . . . is given in evidence, any other act, . . . which is necessary to make it understood may also be given in

Keith and William Keith can testify as to any sexual conduct they may have had with the complaining witness. Larry Keith in its estimation at this point is not a defendant inasmuch as he is now in the juvenile court jurisdiction. Other witnesses may testify as to their presence in various areas where the complaining witness and the defendant may or may not have been; however, those witnesses may not testify as to any alleged sexual conduct that they saw or alleged to have seen between [J.R.] and any of the defendants or Larry Keith." (Italics added.)

This ruling was made a short while before Larry was afforded defendant status for section 1103 purposes.

[10]At the time of the trial Larry was facing juvenile court proceedings arising out of the March 19, 1978, incidents.

evidence." While this rule is, of course, subject to common sense qualifications (e.g., *People v. Williams* (1975) 13 Cal.3d 559, 564-565 [119 Cal.Rptr. 210, 531 P.2d 778]; *People v. Perry* (1972) 7 Cal.3d 756, 787 [103 Cal.Rptr. 161, 499 P.2d 129]), on the basis of what we know about the proposed proof in this case, it would have been quite unfair to the defense to restrict the witnesses' testimony to what they observed with respect to J.R. and defendants. Their credibility would have been severely undermined, had they not been permitted to account for their presence at what is generally considered a private occasion.[11]

This then is what we have called the mirror image of the People's argument that the witnesses were properly prevented from testifying to acts of intercourse between J.R. and defendants: the People would suppress such testimony because it might imply facts which the defense is not permitted to show—consensual intercourse with others. The defense insists that if it is prevented from proving such intercourse, the credibility of its competent witnesses to relevant facts will be unfairly affected. Clearly under the doctrine of multiple admissibility as stated in section 355 of the Evidence Code[12] the defense has the better of that argument.

Of course, since the witnesses could not be prevented from testifying to the facts which explained their presence at the alleged sexual encounters between J.R. and defendants, the latter, too, had to be permitted to testify to those facts.

We believe that the two errors we have discussed compel a reversal with respect to all counts. The excluded testimony could have bolstered Stanley's credibility on the issue of consent to such an extent, that the jury would have entertained a reasonable doubt concerning the other charges.

---

[11]We do not suggest that the record shows that the alleged acts of intercourse between J.R. and defendants were directly observed by the witnesses. In fact the record is quite hazy on that point. It certainly appears, however, that if the witnesses testified as defendants represented they would, their knowledge of what was going on called for an explanation. It is, however, conceivable that closer examination at the retrial will reveal that our fear that the witnesses could not credibly testify to their knowledge of J.R.'s relations with defendants without giving evidence of their own acts of intercourse, is not well founded.

[12]Evidence Code, section 355: "When evidence is admissible as to one party or for one purpose and is inadmissible as to another party or for another purpose, the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly."

Having said this much, we feel compelled to confess to a suspicion that we may be deciding a wholly fictitious case. One cannot help harboring a certain skepticism that the witnesses would have come through as represented. Every single one of them except George Seiko would have had to admit a violation of section 261.5 of the Penal Code—a potential felony. Further, with respect to one or two of the witnesses, the record suggests that they may have been unavailable because they were out of the state. How easy it would have been to test whether defendants really had the evidence for the admission of which they argued so hard and unsuccessfully. While the People quite properly concede that the defense made adequate offers of proof, what we said in *People* v. *Bennett* (1969) 276 Cal.App.2d 172, 176 [80 Cal.Rptr. 706] is still true: "It is unfortunate that we must reverse, for we do not really know whether the offered evidence would have lived up to its advance billing. Offers of proof are rarely colored by pessimism. Unnecessary reversals for failure to receive evidence which does not, in fact, exist, can easily be avoided by hearing the offered proof from the witness, under oath. Quite apart from possibly showing that the witness would have had nothing to contribute had the court ruled differently, the impact of the testimony, if the witness does come through, may cause the court to change an erroneous ruling. In federal nonjury trials, such a procedure is required by rule 43(c) of the Federal Rules of Civil Procedure. (See also 9 A.L.R.3d, 508 at p. 509, fn. 1.)"[13] We strongly urge trial courts, whenever to do so is at all practical, not to accept offers of proof at face value but—to use the vernacular—to force counsel to "put their witness where their offer is."

In our discussion we have hardly mentioned section 782 of the Evidence Code which affects impeachment of the complaining witness in a rape case both substantively and procedurally. No claim is made that the defense failed to comply with the procedural requirements of section 782. On the other hand many of the People's arguments against the ad-

---

[13]We fully appreciate that *Bennett* was written before the Supreme Court, in *Prudhomme* v. *Superior Court* (1970) 2 Cal.3d 320, 326 [85 Cal.Rptr. 129, 466 P.2d 673], explained the full impact of the privilege against self-incrimination. (See also *People* v. *Fries* (1979) 24 Cal.3d 222, 233 [155 Cal.Rptr. 194, 594 P.2d 19].) Had we foreseen *Prudhomme* when we wrote *Bennett*, we might have added that a requirement that an offer of proof be supported by actual proof that the witness will testify as represented, does not necessarily involve any *advance* disclosure of the expected testimony of defense witnesses. All that a sworn offer of proof demands of the defense is disclosure to the court alone of the very evidence the defense wanted to bring to the attention of the jury. No difference in timing is involved unless, of course, the defense wants to waive its rights to play its cards close to the vest and make a motion *in limine*.

missibility of the evidence offered by the defense rely on the laudable intent of section 782 to keep attacks on the credibility of the complaining witness within certain bounds. There really is no need for us to examine these arguments, since, as we have shown, the evidence that was kept out related directly to an element of the defense—consent— rather than to the credibility of J.R. Of course, if the evidence was admissible on the issue of consent, it inevitably affected J.R.'s credibility, because it contradicted her testimony (Evid. Code, § 780, subd. (i)); but there is nothing in section 782 which prohibits impeachment by contradiction—were it otherwise, a charge of forcible rape would become self-proving.

### The Destruction of the Tape

On March 27, 1978, Sergeant Lubbon of the sheriff's department gave J.R. a polygraph examination. The entire interview was tape recorded. J.R. had been brought to the examination by Sheriff's Deputy Melinda Hearne who also left with her. The result of the polygraph examination was inconclusive as far as Sergeant Lubbon was concerned except that he felt that J.R. "was probably deceptive as to the events surrounding the initial contact with the subjects and the events on the evening of the occurrence had probably been overstated." After he had reached that conclusion, Sergeant Hearne called him from the sheriff's station and told him that on the way from the polygraph examination J.R. had confessed to her that she had lied, in that she had not been kidnaped. She then called Sergeant Lubbon who, as a result of his conversation with Deputy Hearne, wrote on J.R.'s record, "admitted to investigating officer after exam that she was not kidnapped. Went willingly. Things got out of hand." Lubbon then determined either independently or after consultation with Sergeant Hearne that the keeping of the tape made by J.R. "served no practical purposes because the statements made during the pretest interview were consistent with the information that [he] had read in the first report and subsequent reports and conversations with the investigating officer." The tape was therefore erased and reused.

The issue of the erased tape will inevitably surface at a retrial. Since it is hard to predict just exactly what evidence might then become relevant for impeachment or on the merits, we hesitate to do more than comment on the matter within the framework of the first trial.

In that context, the erasure of the tape amounted to much ado about nothing. While it is conceivable that the tape might have contained material useful to the defense in impeaching J.R., the uncontradicted evidence is that the story which she related on the tape was the same false story which she first gave to the sheriffs' investigators and which was thoroughly discredited at the trial. In fact it was J.R.'s own admission to Deputy Hearne that she had lied on the tape, which, when related to Sergeant Lubbon, made the tape appear useless. The lack of the tape did not, of course, prevent the defense from developing how and when J.R. changed stories.

We further point out that the tape was not the product of the primary investigation, as were the investigating officer's "rough interview notes" in *In re Gary G.* (1981) 115 Cal.App.3d 629, 639-642 [171 Cal.Rptr. 531]. The lie detector examination was a collateral investigative tool which was abandoned when its purpose had been served in a different fashion.

Having fully in mind the seminal decision of *People* v. *Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr 9, 527 P.2d 361], and its development in *People* v. *Zamora* (1980) 28 Cal.3d 88 [134 Cal.Rptr. 784, 557 P.2d 75], it is our belief that under all of the circumstances no punitive sanctions for the erasure of the tape were called for. We certainly, however, do not wish to tie the hands of the trial court on retrial, if additional evidence on this subject should come to light.

The judgment is reversed.

Stephens, J., and Hastings, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied July 8, 1981.