Filed 6/15/23  In re H.Z. CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| In re H.Z., a Person Coming Under the Juvenile Court Law. | C096330 |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>H.Z.,<br><br>        Defendant and Appellant. | (Super. Ct. No. JD-2021-128) |

A juvenile court adjudged H.Z. (the minor) a ward of the court under Welfare and Institutions Code section 602 after finding that he committed the crimes of forcible rape and forcible oral copulation against D.H.[1]  The juvenile court also retained jurisdiction

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

over the minor until he attains 25 years of age pursuant to section 607, subdivision (c), and placed him on formal probation subject to various terms and conditions.

On appeal, the minor contends the prosecutor engaged in prejudicial prosecutorial misconduct during closing argument by using expert testimony regarding rape trauma syndrome to corroborate D.H.'s testimony that she was raped by the minor. We affirm. While certain statements made by the prosecutor misstated the proper use of such expert testimony, we are satisfied that the juvenile court did not use this testimony in an improper manner.

BACKGROUND

In July 2021, the People filed a juvenile wardship petition under section 602, alleging the minor committed the crimes of forcible rape and forcible oral copulation against D.H. in March 2018. The following facts, which we recite in the light most favorable to the judgment (see *In re Adrian R.* (2000) 85 Cal.App.4th 448, 452), were adduced during the hearing on the petition.

The minor was 16 years old at the time of these offenses. D.H. had just turned 17 years old. As she explained during her testimony at the hearing, she and the minor were friends in elementary school, but fell out of contact after that because they attended different schools. Around February 2018, they reconnected and went on a couple of dates together. D.H. described their relationship as "what people called 'talking,' " explaining that it was "a step before a dating relationship."

In March 2018, the minor and D.H. had plans to go to out together for dinner. The minor picked her up at approximately 4:00 p.m., they drove around for a while, and then the minor said he had to pick up something from his house. When they got there, D.H. followed him to his bedroom and sat on the edge of his bed. She thought he was going to grab whatever he needed to pick up and they would continue to the restaurant. Instead, the minor sat on the bed next to her and started playing a video game while she watched. A short time later, they started kissing. The minor then told D.H. to take off her clothes.

Now uncomfortable, D.H. responded: "No. Can we please go eat?" Undeterred, the minor started pulling off D.H.'s clothes, first her shorts, then her tank top, and finally her underwear. While D.H. did not tell him to stop undressing her, she "kept asking him if [they] could go eat like [they] were supposed to." The minor did not respond and continued undressing D.H., who "froze" in response.

The minor then retrieved a condom from his bedside table, undressed himself, and got on top of D.H. on the bed. D.H. was scared and "still feeling frozen." Her arms were down by her sides and the minor's hands were holding them down on the bed. He then removed one hand in order to put on the condom and D.H. started trying to "scoot" herself out from underneath him. The minor penetrated D.H.'s vagina with his penis while she said more than once that she did not want to have sex. D.H. continued "trying to shift" her body "to the other side of his bed" because she did not want to have sex with him. She also again asked to go eat. At this point, the minor stopped and said he "couldn't finish" because D.H. was moving around and kept asking to leave. He "sounded frustrated."

D.H. took this opportunity to get off the bed and put her clothes back on. As she reached for the bedroom door to try to leave, the minor grabbed her other hand and pulled her back over to the bed. He then said she was not leaving until he "finished." D.H. sat on the bed and asked what she had to do for him to take her home. The minor responded: "You can give me head." D.H. was "disgusted," but "thought it was the only way he was going to take [her] home," so she complied with the demand. After the minor ejaculated, he said that she "didn't count" as someone he had sex with because he did not "finish" while they were having sex. The minor then got dressed and took her home.

After these events, the minor and D.H. talked "once or twice more" and then D.H. unfollowed and blocked him on social media. She did not tell anyone about the rape until about a year later, in May 2019, when she told a small group of friends. She did not provide details. One of these friends testified at the hearing and confirmed that D.H. told

him about the rape without providing details sometime during their senior year of high school.

About a year after D.H.'s first disclosure, in June 2020, as part of a "Me Too" Twitter thread in which victims of sexual assault were sharing their ages when they were assaulted, D.H. tweeted: "I was 17."

Three months later, in September 2020, D.H. told her mother about the rape. Her mother testified at the hearing and confirmed that D.H. had called her while crying and having a panic attack. D.H. told her that she needed to talk and to meet her at a nearby parking lot. When her mother arrived, D.H. was in a car with her boyfriend at the time. She was still experiencing the panic attack. While crying and struggling to catch her breath, D.H. disclosed that she had been sexually assaulted in the past and something that happened that night triggered her to have a flashback of that sexual assault. D.H. did not provide any details, and she did not tell her mother who had assaulted her until about two weeks later, at which point she identified the minor. This information was shared with D.H.'s father, who was a police officer, but he did not bring the subject up with his daughter. He wanted to allow D.H. to come to him when she was ready to talk about it. D.H. testified that she did not want to report the rape to the police at that point because she "felt that it had been too long since it occurred."

That changed after D.H. and her parents attended a holiday event at a local pub in May 2021. The minor and a girlfriend, S.A., were also there, seated at a nearby table. When D.H. saw them, she started to have another panic attack, which prompted her to get up from the table and take a walk. When she returned, she asked her parents if they could move tables, which they did. D.H. still felt anxious, however, because the minor and S.A. kept looking over at their table. When she told her parents that she wanted them to stop, D.H.'s father walked over to the minor and said: "I'm going to ask you to stop staring at [D.H.] or I'm going to have to ask security to make you leave." The minor

responded: "I don't even know what the eff you're talking about." D.H.'s father returned to their table and the minor stopped looking at them.

D.H. decided to report the rape to the police the next day. As she explained, S.A. had posted about the confrontation between D.H.'s father and the minor on social media. S.A. also drove past her house later that night while honking her horn. D.H. then saw that S.A. had also tweeted that her father was "using his privilege as a police officer." These actions angered D.H. and made her feel further violated. She decided to report what the minor had done to her because, as she explained: "I was not going to be harassed for something that was forced upon me."

After D.H. reported the rape to the police, she provided a statement that was consistent with her testimony at the hearing. D.H. also made a pretext phone call to the minor, during which the minor repeatedly claimed that he did not remember what happened between them.

The minor was also interviewed by the same detective who interviewed D.H. The minor's statement is replete with internal inconsistencies. For example, the minor first claimed, repeatedly, that D.H. had never been in his house. He then admitted she had been in his house, but they just "hung out for like an hour or two." He then admitted that he and D.H. kissed while in his bedroom, but claimed that he stopped kissing her when she said: "Stop. Don't kiss me. Stop." The minor then admitted he tried having sex with D.H., but that he stopped after she told him: "No." Later in the interview, the minor denied that he wanted to have sex with D.H., except to the extent that "kissing on her was like, like, I guess like wanting to have sex." He then denied that D.H. ever told him no, and further denied that he previously said she did. According to the minor's new account of events, he and D.H. were kissing and feeling each other's bodies, and he "asked her if she would give [him] head," which she consensually did. Later in the interview, the minor agreed with the detective's statement: "I think all [D.H.] wanted to do was, you know, . . . to go home. And, you know, you just wanted to finish." The minor then

repeatedly claimed that D.H. never told him that she wanted to go home. Then, when the detective described D.H.'s version of the oral copulation (i.e., D.H. trying to leave the bedroom, the minor grabbing her hand and pulling her back to the bed, D.H. saying, "What do I have to do . . . for you to take me home," and the minor responding, "You could give me head"), the minor responded: "Yeah, that sounds accurate." Twice more, the minor agreed that this is what happened. Then, when asked again to confirm that D.H. said, "What do I have to do for . . ." the minor interrupted: "No, she didn't say. She never said anything like that. She never — let me take that back, she never said anything like that." The interview concluded with the minor saying he wanted to apologize for asking D.H. to orally copulate him when she wanted to go home, but again claimed he "didn't think she wanted to go home" at the time.

The prosecution also presented expert testimony regarding rape trauma syndrome at the hearing. We recount this testimony during the discussion portion of this opinion.

We finally note that the minor testified in his own defense at the hearing, and the defense also presented additional witnesses, including S.A. and one of her friends. We need not recount this testimony in any detail. It will suffice to note that the minor's version of events at the hearing was that he and D.H. kissed in his bedroom, he asked her to orally copulate him, which she consensually did, and he ended the sexual act before ejaculating because he feared his parents were coming home. He also admitted lying to the detective, claiming he did so because he was afraid of getting in trouble. Based on the minor's testimony, and that of S.A. and her friend, the defense's theory of the case was that D.H. fabricated the rape allegation against the minor because "she [was] blown off" by the minor at a party after the alleged incident and felt "hurt, angry, [and] betrayed" that the minor was dating S.A.

DISCUSSION

*Prosecutorial Misconduct*

The minor contends the prosecutor engaged in prejudicial prosecutorial misconduct during closing argument by using expert testimony regarding rape trauma syndrome to corroborate D.H.'s testimony that she was raped by the minor. In response, the People argue this contention fails because the minor has not demonstrated that the juvenile court misapplied the challenged comments. While we agree with the minor that the prosecutor misdescribed the proper use of the expert's testimony, the People are correct that the minor has not carried his appellate burden of demonstrating reversible error.

A.     *Additional Background*

Prior to trial, the prosecutor moved to introduce expert testimony from Jaime Gerigk, a certified social worker with a master's degree in social work, regarding rape trauma syndrome. Citing *People v. Bledsoe* (1984) 36 Cal.3d 236, this motion explained that Gerigk's testimony was being offered to explain "common victim responses to the trauma of sexual assault and common myths and misconceptions regarding sexual assault, including why victims of sexual assault may not fight back, may not sustain injuries, [and] may not immediately report, among other topics." The motion further explained: "Her testimony is not being offered to prove that the victim was in fact raped and is instead [offered] to '. . . disabuse the [fact finder] of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths.' "

The minor also relied on *Bledsoe* in moving to exclude this evidence. After describing this decision in detail, including our Supreme Court's holding that "[e]xpert testimony that the complaining witness was suffering from rape trauma syndrome was inadmissible to show a rape had actually occurred because the syndrome was developed as a 'therapeutic tool' and **not to determine the ' "truth" or "accuracy" of a**

**particular past event'** [citation]," the minor acknowledged such evidence "could be used to disabuse the jury/finder of fact of some widely held misconceptions about rape and rape trauma victims." However, the minor argued, the evidence should nevertheless be excluded under Evidence Code section 352 because "[t]he main myth it is used to dispel is delayed disclosure," but the probative value of the evidence for this purpose is low because the fact that rape victims often delay disclosing the rape occurred "is 'within the ken of the jury, perhaps obviating the need for expert evidence on the issue of delay[,]' " whereas "the prejudicial effect of expert testimony regarding the subject of sexual assault is obviously high." In the alternative, the minor argued Gerigk's testimony "should be narrowly tailored and carefully scrutinized to ensure the testimony is not admitted to establish the complaining witness has been sexually assaulted nor improperly allow the finder of fact to draw predictive conclusions from the testimony."

The juvenile court ruled the proffered testimony would be allowed, overruling the minor's objection under Evidence Code section 352, and then expressly stated that it understood the proper use of such evidence was "not to determine the truth or accuracy that the particular event actually occurred or that the person testifying, the complaining witness, is an actual victim," but rather "to dispel myths." The minor does not challenge this ruling on appeal.

Gerigk testified in accordance with the juvenile court's ruling, and the minor does not argue otherwise. Gerigk testified that rape trauma syndrome has three phases: (1) an "acute phase," in which "victims talk about feeling numb, freezing, being in shock, disbelief, confusion around what just happened, especially if they know the person who did it to them"; (2) an "outward adjustment phase," in which the victims often appear to the outside world "like they're doing okay, but inside there's a lot of inner turmoil," and "over time, as much as they don't want to talk about it or think about it, it becomes . . . consuming for them, and they start to experience those symptoms similar to post-traumatic stress disorder"; and (3) a "resolution or integration" phase, in which the

victims are no longer consumed by their assault, but rather "start to integrate the sexual assault into the whole of their life."  Gerigk testified that one common myth or misconception was that a victim of rape would always fight back, when the reality is "we have no idea how we're going to react" to a traumatic event, "there isn't any right or wrong way to respond," and many rape victims experience one of the typical trauma responses, "freeze or fight or flight."  Gerigk also testified that rape victims often delay disclosing the event, or do not report it at all, explaining that during the acute phase, they are "often in shock and disbelief," and in the subsequent phases, "they're often blamed or judged for not reporting earlier, so that has an impact."  Finally, Gerigk explained that when disclosures to friends or family do occur, they are often incomplete for a number of reasons, including "shock, disbelief," "shame and embarrassment," and an inability to remember all of the details because of "how our brain works after a traumatic event."

During closing argument, the prosecutor argued as follows with respect to Gerigk's testimony:  "Jaime Gerigk testified about rape trauma syndrome and she helped dispel some of the common myths and misconceptions that [the] public has about rape. There's no, quote, a right way for a victim to react during a crime.  Instead, it's incredibly common for victims to freeze and be in shock during the incident of rape itself.  [¶] [D.H.] testified that she was afraid, that she felt in shock, shocked that someone she trusted would do this to her.  Shocked this was even happening to her, that she was being raped.  [¶]  It's also incredibly common not to fight back or scream.  It goes back to that being in shock.  Victims, and specifically [D.H.], did what her instincts told her to do, say no and squirm but try not to make things worse, try not to anger him, try not to be injured, and try to get through this ordeal as quickly as possible.  [D.H.] was only 17 years old and put in an unexpected situation that nobody would be ready for.  And her actions that day were in no way inconsistent with this being a real rape simply because she didn't conform to antiquated notions how a rape victim should react.  [¶]  We also know that it's incredibly common for victims of acquaintance rape not to report

immediately. The rape victim will report, 'Why did I put myself in that situation? Why did I wear those clothes? Could I have done something to prevent it?' It's common for those victims not to report right away because it takes time to process the trauma of what they've been through. Coming to terms with such an event is not easy, let alone for a 17-year-old child. It took [D.H.] some time before she was ready to disclose to others what happened to her. It's far easier to ignore what happened, pretend it didn't happen, and try to go on. [¶] Jaime Gerigk talked about being in an acute phase right afterwards where you're kind of in shock and numb, and that's exactly what [D.H.'s] testimony showed. When she got home after that rape, she was numb and in shock and not ready to deal with it. [¶] She went through the outward adjustment phase and tried to bury what happened and not deal with it. When it became too much for her to [bear], she disclosed to her closest friends. All of [D.H.'s] actions in this case are consistent with rape trauma syndrome and with this being rape. [¶] Jaime Gerigk's testimony demonstrates that [D.H.'s] reaction during the rape and after are consistent with her being raped and provides further corroboration for her testimony."

The minor's counsel objected to this argument to the extent that it suggested that D.H. "exhibit[ing] some of these" "symptoms or [] behaviors . . . equals [D.H.] was raped." The juvenile court overruled the objection, noting "this is argument and it will be up to the fact finder to determine whether or not that's a reasonable inference based on everything that the Court [has] heard."

B.      *Analysis*

As stated previously, the minor does not take issue with Gerigk's testimony, acknowledging it "may have been admissible" for the limited purpose of "disabus[ing] 'the [fact finder] of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths[,]' " quoting *People v. Bledsoe, supra*, 36 Cal.3d at pages 247-248. However, the minor argues, "the People's argument went further and was improper." He specifically cites the following portion of

the argument: "Jaime Gerigk's testimony demonstrates that [D.H.'s] reaction during the rape and after are consistent with her being raped and provides further corroboration for her testimony." We agree the prosecutor's argument veered outside the confines of *Bledsoe*. While there was nothing wrong with most of the prosecutor's comments regarding Gerigk's testimony, suggesting that this testimony corroborated D.H.'s testimony that she was in fact raped by the minor is an improper use of the evidence. We disagree, however, that the prosecutor's misstatement amounts to reversible prosecutorial misconduct.

"Under the federal Constitution, a prosecutor commits reversible misconduct only if the conduct infects the trial with such ' "unfairness as to make the resulting conviction a denial of due process." ' [Citation.] By contrast, our state law requires reversal when a prosecutor uses 'deceptive or reprehensible methods to persuade either the court or the jury' [citation] and ' "it is reasonably probable that a result more favorable to the [minor] would have been reached without the misconduct" ' [citation]." (*People v. Davis* (2009) 46 Cal.4th 539, 612.) Thus, "[i]n order to state a case of misconduct sufficient to warrant reversal, . . . it is incumbent upon the minor to demonstrate prejudice resulting from the misconduct." (*In re Gary G.* (1981) 115 Cal.App.3d 629, 637.)

Here, we cannot conclude the single sentence of argument specifically challenged in this appeal resulted in a denial of due process under the federal Constitution. Nor can we conclude that the prosecutor's comment amounted to a deceptive or reprehensible method of persuasion. Moreover, the minor has not demonstrated a reasonable likelihood that the challenged comment would have induced the juvenile court, as the finder of fact, to improperly use Gerigk's testimony to conclude D.H. was raped, as opposed to properly using it to determine whether her "reactions as demonstrated by the evidence are not inconsistent with having been [raped]." (*People v. Bowker* (1988) 203 Cal.App.3d 385, 394; see *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 93 [in order to establish prejudicial prosecutorial misconduct based on argument to the jury, there must be a

"reasonable likelihood any juror would have applied the prosecutor's comments erroneously"].)

To the contrary, as we have described in some detail, the parties' briefing on the admissibility of Gerigk's testimony set forth the boundaries of admissibility with admirable clarity. The juvenile court confirmed on the record that it understood these boundaries. Finally, the juvenile court provided a detailed summary of the evidence before finding beyond a reasonable doubt that the minor committed the crimes of forcible rape and forcible oral copulation. The juvenile court believed D.H.'s account of these crimes, finding her to be "credible" and her "memory of events . . . very clear and consistent with very few inconsistencies." Turning to the minor, the juvenile court made clear that it did not believe his testimony, agreeing with the prosecutor's characterization of his various accounts of events as a "mountain of lies" and a "bodyguard of lies . . . thrown up by [the minor] to describe what happened." Only after making these observations did the juvenile court refer to Gerigk's testimony, indicating that D.H.'s reactions were consistent with what the expert outlined with respect to victims of rape in general. But nowhere did the juvenile court indicate that it was concluding from this consistency that D.H. was in fact raped, rather than simply concluding that her reactions were not inconsistent with having been raped, and therefore the credibility calculus already described did not need to be altered.

For the foregoing reasons, the minor's assertion of prejudicial prosecutorial misconduct fails.

## DISPOSITION

The judgment is affirmed.

                                     /s/
                              BOULWARE EURIE, J.

We concur:

    /s/
HULL, Acting P. J.

    /s/
KRAUSE, J.